UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL BOYKIN, as administrator of the Estate of JOHN L. PHILLIPS, and MELVIN DOZIER and KEVIN DOZIER, as Co-Guardians of IRENE DOZIER, an Incapacitated Person, and MELVIN DOZIER and KEVIN DOZIER, and GEORGIA LEWIS as administrator of the Estate of MARY JOAN BARNETT, Individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>        – against –<br><br>1 PROSPECT PARK ALF, LLC, PROSPECT PARK RESIDENCE HOME HEALTH CARE, INC., PROSPECT PARK RESIDENCE LLC, KOHL ASSET MANAGEMENT, INC., and KOHL PARTNERS, LLC<br><br>           Defendants. | **Memorandum and Order on Background of Assisted Living Industry in Preparation for Argument on Motions for Summary Judgment and Class Certification**<br><br>No. 12-CV-6243 |

**Appearances:**

**For Plaintiffs:**

Hunter Jay Shkolnik, Adam Julien Gana, Christopher L. Lufrano
Napoli Bern Ripka Shkolnik, LLP
New York, NY

Dennis Kelly, John O'Hara
Glen Head, NY

**For Defendants:**

Joel A. Drucker
Randolph, NJ

Luigi Spadafora, Kenneth A. McLellan, Keith Robert, Martin Roussel
Winget, Spadafora & Schwartzberg, LLP
New York, NY

JACK B. WEINSTEIN, Senior United States District Judge:

<u>**Table of Contents**</u>

I.     Introduction ................................................................................................................ 1

II.    Disclosure of Independent Research ........................................................................... 3

III.   Assisted Living Residences and Related Services ...................................................... 4

  A.   In General .................................................................................................................. 4

  B.   Variety of Related Regulated Care Facilities ............................................................ 4

  C.   Federal Regulation of Services for Older Adults: Nursing Homes ........................... 7

    1.   United States Senate Hearings: America's Nursing Homes, 1965 ............................ 9

    2.   New York Nursing Home Scandal of the 1970s .................................................... 16

  D.   Rise of the Assisted Living Residence ..................................................................... 20

  E.   Assisted Living Residences in New York State ....................................................... 25

    1.   New York State Assisted Living Reform Act of 2004 ........................................... 25

    2.   Article 78 Proceeding ............................................................................................. 27

    3.   Statutory Purpose and Regulatory Enforcement of the ALR Act ........................... 29

    4.   Ombudsperson Program .......................................................................................... 35

      a.   United States ........................................................................................................ 35

      b.   New York State .................................................................................................... 36

IV.    Conclusion ................................................................................................................ 40

Appendix: Glossary ........................................................................................................... 42

**I.   Introduction**

     Plaintiffs are the legal representatives of former residents of Prospect Park Residence, an assisted living residence located in Brooklyn.  They assert state and federal causes of action on behalf of themselves and all former and current residents of the Residence.  Claimed is that the owners and managers lacked a license to operate an assisted living residence and intentionally defrauded plaintiffs by omitting that fact from marketing and other materials.  Licensing has now apparently been obtained.  It is alleged that these material misrepresentations caused plaintiffs to pay excessive rents and fees.

Defendants' motion to dismiss the complaint on the pleadings was converted by court order to one for summary judgment.  *See* Mem. and Order, May 31, 2013, ECF No. 33.  The parties are now engaged in expedited discovery.  *See, e.g.*, Scheduling Order, June 17, 2013 (unnumbered docket entry).  Motions by defendants for summary judgment and by plaintiffs to certify the class will be argued on November 14, 2013.  *See* Order, June 24, 2013, ECF No. 39; Order, Aug. 6, 2013, ECF No. 43.

The parties have previously been instructed that "[t]he focus at the summary judgment stage will be on . . . issues related to class action certification, subject matter jurisdiction, and the statute of limitations."  Mem. and Order, May 31, 2013, ECF No. 34.  Central to these issues is "whether the plaintiffs can show a compensable injury caused by defendants' conduct as required under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c), or any other theory.  *Cf. Anza v. Ideal Steel Supply Co.*, 547 U.S. 451 (2006)."  *Id.*  Additional issues to be addressed by the parties are (1) whether there is an independent right to sue to enforce New York State's assisted living residence licensing requirements and (2) what damages, if any, flow from lacking a license.

As outlined in Part III, *infra*, there is a long history in New York and elsewhere of abuse in institutions that care for the elderly.  Strong efforts through legislation, enforcement activities and a network of ombudsperson volunteers under the direction of social workers has been established to help ensure that the vulnerable are treated properly.  This background may be critical in approaching the questions now posed because it affects such issues as whether individual and class actions are authorized to enforce regulation of assisted living residences.  A reference to relevant background studied by the court is provided to aid the parties in preparing to brief and argue defendants' and plaintiffs' motions.

2

A prior order requiring broadcasting of the hearing to prospective class members was issued on July 25, 2013. *See* Mem. and Order, July 30, 2013, ECF No. 42. It remains in effect.

## II. Disclosure of Independent Research

This memorandum and order informs the parties of independent research by the court which may affect its decision but is not subject to judicial notice limitations under Rule 201 of the Federal Rules of Evidence. *See* Essay, *Limits on Judges Learning, Speaking and Acting— Part I—Tentative First Thoughts: How May Judges Learn?*, 36 Ariz. L. Rev. 539, 560 (1994) ("Whenever possible, materials and notices of work and studies should be filed and docketed or announced at sessions with attorneys and experts."); Fed. R. Evid. 201.

While impartiality is essential to administration of the rule of law, it does not keep a judge "ensconced in chambers and out of contact with the world." *Limits on Judicial Learning*, *supra*, at 557 (citing *United States v. Doering*, 384 F. Supp. 1307, 1309 n.2 (W.D. Mich. 1974)). Knowledge that judges bring to the courtroom and any presented by the parties on the record may be insufficient for the court to adequately understand fully the subtleties of a case. *Id.* at 541. *See also* George D. Marlow, *From Black Robes to White Lab Coats: The Ethical Implications of a Judge's Sua Sponte, Ex Parte Acquisition of Social and Other Scientific Evidence During the Decision-Making Process*, 72 St. John's L. Rev. 291, 326 (1998) (recommending amendments to judicial ethics codes permitting "judges, when they deem it necessary, in lawsuits involving difficult questions of technological or social science, to look beyond evidence presented by the parties").

The parties will have an opportunity to address the court's research through their briefs at the summary judgment and class certification stages. *Cf. Limits on Judges Learning, Speaking and Acting—Part I*, *supra*, at 560 ("Parties must have the opportunity to counter . . . extra-judicial sources of knowledge.").

III. Assisted Living Residences and Related Services

    A.  In General

Addressed is the rise of assisted living residences (ALR) in the United States, the differences between ALRs and nursing homes and related institutions, the history of abuse in these industries, and social work assistance in supervising ALRs.  Examined is New York's ALR industry: its development, the State's attempt to improve and control it for the benefit of residents, and the statutory and regulatory scheme governing ALRs and similar private institutions.

A major factor in the improved oversight of care for the institutionalized elderly is the Ombudsperson Program.  Skilled social workers train a large corps of volunteers who are stationed in these institutions to help the residents, by making sure they receive the services they are entitled to, and that government regulations are enforced—all with the assistance of the legal profession.

Central to plaintiffs' claims is their contention that there existed a material difference between the services they thought they had bargained for from a licensed ALR and the services they actually received in an unlicensed ALR.

    B.  Variety of Related Regulated Care Facilities

There are a number of different kinds of private institutions supplying varying degrees of care for people across a spectrum from temporary ill-health to long-term, serious incapacitation. The relevant statutory definitions of some of the main types of institutions that are regulated by the New York State and federal governments are described below:

"Assisted living" services are regulated only by State law; no federal law applies. Section

4651(1) of New York Public Health Law Article 46-B (Assisted Living Reform Act) defines

"Assisted Living" and an "Assisted Living Residence" as:

> An entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home care services (either directly or indirectly) in a home-like setting to five or more adult residents unrelated to the assisted living provider. *An applicant for licensure as assisted living that has been approved . . . must also provide daily food service, twenty-four hour on-site monitoring, case management services, and the development of an individualized service plan for each resident.* An operator of assisted living shall provide each resident with considerate and respectful care and promote the resident's dignity, autonomy, independence and privacy in the least restrictive and most home-like setting commensurate with the resident's preferences and physical and mental status.

N.Y. Pub. Health L. § 4651(1) (emphasis added).

The terms "enhanced assisted living" and "enhanced assisted living resident" are defined

under New York law as "the care or services provided, or a resident who is provided the care and

services, pursuant to an enhanced assisted living certificate." N.Y. Pub. Health L. § 4651(14).

An "enhanced assisted living certificate" is:

> a certificate issued by the department [of health] which authorizes an assisted living residence to provide aging in place by either admitting or retaining residents who desire to age in place and who: (a) are chronically chairfast and unable to transfer, or chronically require the physical assistance of another person to transfer; (b) chronically require the physical assistance of another person in order to walk; (c) chronically require the physical assistance of another person to climb or descend stairs; (d) are dependent on medical equipment and require more than intermittent or occasional assistance from medical personnel; or (e) has chronic unmanaged urinary or bowel incontinence. *In no event shall a person be admitted to an assisted living residence who is in need of continual twenty-four hour nursing or medical care, who is chronically bedfast, or who is cognitively, physically or medically impaired to such a degree that his or her safety would be endangered.*

N.Y. Pub. Health L. § 4651 (emphasis added).

By contrast to the assisted living industry, oversight of "nursing homes" is shared

between federal and state governments.

Under New York law, a "Nursing home company" is:

> A non-profit nursing home company, duly incorporated pursuant to the provisions of the not-for-profit corporation law and this article, or a limited-profit nursing home company duly incorporated pursuant to the provisions of this article for the purpose of providing nursing home accommodations, including board and nursing care by or under the supervision of a duly licensed physician to sick, invalid, infirm, disabled or convalescent persons of low income or of providing health-related service as defined in article twenty-eight of this chapter to persons of low income, or any combination of the foregoing, and in addition thereto, of providing nursing care and health-related service, or either of them, to persons of low income who are not occupants of the project, and such other facilities as may be deemed by the commissioner to be incidental and appurtenant thereto.

N.Y. Pub. Health L. § 2852(2).

As defined under regulations promulgated by the New York State Department of Health,

a "Nursing Home" is:

> a facility, institution, or portion thereof subject to article 28 of the New York State Public Health Law, providing therein, lodging for 24 or more consecutive hours to three or more nursing home residents who are not related to the operator by marriage or by blood within the third degree of consanguinity, *who need regular nursing services or other professional services but who shall not need the services of a general hospital*.

N.Y. Comp. Codes R. & Regs. tit. 10, § 415.2 (emphasis added).

Requirements for nursing homes under Medicare are set forth under federal law. A

"Skilled nursing facility" is "an institution (or a distinct part of an institution) which—

> (1) is primarily engaged in providing to residents—
>
> > (A)    skilled nursing care and related services for residents who require medical or nursing care, or
> >
> > (B)    rehabilitation services for the rehabilitation of injured, disabled, or sick persons, and is not primarily for the care and treatment of mental diseases;
>
> (2) has in effect a transfer agreement (meeting the requirements of section 1395x(l) of this title) with one or more hospitals having agreements in effect under section 1395cc of this title; and

6

(3) meets the requirements for a skilled nursing facility described in subsections (b), (c), and (d) of this section."

42 U.S.C. § 1395i-3(a).  *See also* 42 C.F.R. 483.5; Appendix: Glossary, *infra*.

### C.  Federal Regulation of Services for Older Adults: Nursing Homes

Although the Social Security Act of 1935 is now best known for creating a form of insurance for older adults after retirement, one of its initial aims was Old Age Assistance—a program that provided cash payments to poor, elderly people regardless of their work record. *See* Patrick A. Bruce, *The Ascendancy of Assisted Living: The Case for Federal Regulation*, 14 Elder L. J. 61, 65 (2006).  The Social Security Act provided a new flow of income to America's older adults, coinciding with a rise in private convalescent homes opened by individuals in their own homes.  *Id.*  These were the precursors to nursing homes.  *Id.* at 66-67.  By the mid-1940s, entrepreneurs began to open nursing homes, which offered extensive nursing care and other services in formal, institutional settings.  *Id*.  The industry quickly expanded.

In 1950 Congress amended the Social Security Act to provide significant federal funding and oversight of nursing homes.  *Id.*  Congress required states to establish licensing standards for state-operated nursing homes in exchange for federal matching funds.  *Id*.  The federal government effectively became the nation's biggest subsidizer of nursing home care.  *Id.*  In the 1960s, the advent of Medicare and Medicaid strengthened the federal government's regulation of the nursing home industry.  *Id.*  The federal Nursing Home Reform Act of 1987 tightened standards.  *Id.*  As a result, nursing homes are subject to substantial federal regulation, though states have authority to enforce their own statutes and regulations relating to licensing, operation, and reimbursement by Medicaid.  *See generally id*. 68; Ari J. Markenson, *Nursing Homes: Overview of Federal and State Regulation*, 9 NYSBA Health L. J. 17, 17 (2004).

The Older Americans Act of 1965 (OAA) was the first federal legislation aimed at providing comprehensive community planning and services to America's older adults. *See generally* U.S. Dep't. of Health and Human Servs. Admin. on Aging, *Older Americans Act*, http://www.aoa.gov/AoARoot/AoA_Programs/index.aspx ("Admin. on Aging").  The Act was intended to provide older adults with equal opportunities to retire in dignity and comfort, to maintain a healthy, active lifestyle, and to be protected from abuse, neglect and exploitation. Older Americans Act § 101, 43 U.S.C. § 3001.  It established the National Aging Network, a coalition of federal agencies that fund federal and state programs to assist older adults. *See* Admin. on Aging, *supra*.

Pursuant to the OAA, New York State established its Office of the Aging.  It provides assistance to older adults in obtaining social services, government benefits, legal services, transportation, housing, meals, employment, and counseling. *See* N.Y. State Dep't. of Health Office for the Aging, http://www.aging.ny.gov/NYSOFA/AboutNYSOFA.cfm  ("N.Y. Office for the Aging").

Enforcement of the State and federal policies governing long-term care has not been fully effective, in part because lacunae exist in the enforcement provisions of the Nursing Home Reform Act of 1987, resulting in enforcement, regulation, and inspection that may be more lax than is appropriate. *See* Eric M. Carlson, *Siege Mentality: How the Defensive Attitude of the Long-Term Care Industry is Perpetuating Poor Care and an Even Poorer Public Image*, 31 McGeorge L. Rev. 750, 753 (2000) (describing "a loophole-ridden system").  As a result, the industry is often viewed with skepticism.

1.      **United States Senate Hearings: America's Nursing Homes, 1965**

In August, 1965, the Subcommittee on Long-Term Care of the United States Senate Special Committee on Aging conducted public hearings examining the state of America's nursing homes. *See generally Conditions and Problems in the Nation's Nursing Homes: Hearings Before the Subcommittee on Long-Term Care of the United States Senate Special Committee on Aging, Part 5—New York City*, 89th Cong. 375-77 (1965) ("Subcomm. Hr'g"), (statement of Sen. Frank E. Moss, Chairman, S. Subcomm. on Long-Term Care), *available at* http://www.aging.senate.gov/publications/821965.pdf.  Two weeks earlier, on July 14, President Johnson had signed the OAA into law and, two days earlier, he had approved the Medicare program. *Id.*

The Subcommittee on Long-Term Care took testimony from a wide variety of authorities, including New York City's acting mayor Paul R. Screvane, future mayor John V. Lindsay, professors and administrators from Columbia University's School of Public Health and Administrative Medicine, presidents and directors of nursing homes and industry associations, and administrators from the Departments of Welfare, Social Services, and Public Affairs. *Id.* at iii (listing witnesses and statements provided).  The stated goal of the hearings was to:

> [M]ak[e] a thorough and comprehensive study of the conditions and problems in the Nation's nursing homes, to review the operations of Federal and State programs in this field, and to reappraise the role of the Federal Government in assisting in the development of appropriate and high-quality services for the long-term patient . . . . [and] to assess the impact on [nursing homes] of Federal programs and the capacity of these institutions to provide the services they call for, to identify the remaining gaps in the availability of services and quality of services, and to consider whether additional action in the Federal field is needed and appropriate to fill these gaps.

*Id.* at 375-76.  The federal government seemed poised to dedicate energy and attention to the needs of the country's vulnerable older population.

Two days of hearings were devoted to New York City's nursing homes and the City's recently revised nursing home code.  *Id.* at 376.  The Subcommittee referred to New York City as "one of the Nation's great medical centers" and its nursing home code as "one of the best . . . to be found in the country."  *Id.*  Senators were especially interested in the City's innovations in nursing home organization and oversight, as well as the City's system for providing in-house medical care to nursing home patients.  *Id.*

Mayor Screvane reported that a lengthy investigation into nursing homes by City officials revealed "shocking conditions" and had prompted the revision of the City's nursing home code. *Id.* at 379 (statement of Hon. Paul R. Screvane, Acting Mayor, New York, New York).  The new code was enacted over strong industry opposition.  *Id.*  It prescribed new standards for physical facilities, to be applied both to existing and new facilities; it established quotas for personnel and personnel-to-patient ratios; and it described the services nursing homes must provide.  *Id.* Facilities that could not adapt to the new requirements were shut down.  *Id.*  Although the new code effectively reduced the number of nursing home beds available in New York City, it significantly "cut down the number of horrors."  *Id.*

The mayor praised the City's progress in providing quality long-term care, but he saw room for improvement:

> It is true that we have done away with the houses of horror of a few years ago, where aged men and women were kept in conditions which were shocking and almost medieval in their lack of respect for human dignity.
>
> Those conditions in nursing homes seem to have been practically eliminated, as a result of our nursing home code and its enforcement.  Yet, some of our aged live or rather exist in conditions of unspeakable squalor, not institutions, but in rooming-houses, tenement flats, and private homes.
>
> Many are in hospitals who should be in nursing homes.  Slender lifesavings are being eaten up in quick gulps and relatives are being impoverished . . . .

10

*Id.* at 379-80.  Foreshadowing the development of the assisted living residence, Mayor Screvane noted the lack of "halfway facilities," which could offer services outside an individual's home but not yet at the level of care provided by a nursing home.  *Id.* at 379.

The mayor outlined his goals for the City in the field of long-term care: (1) to open an additional 15,000 nursing home beds operated by City and voluntary agencies, (2) to develop facilities for older adults who need a supportive environment but do not require convalescent or nursing home care, (3) to acquire substantial federal assistance and funding for nursing and convalescent home construction, and (4) to confront the City's needs—stemming from the recent passage of Medicare—with sufficient manpower and planning.  *Id.*

Dr. James G. Haughton, M.D., elaborated on the history of nursing home conditions in New York City.  *Id.* at 384 (statement of Dr. James G. Haughton, M.D., Deputy Medical Welfare Administrator, Bureau of Medical Services, N.Y.C. Department of Welfare).  In 1944, he reported, the New York State Department of Welfare Services decided that a nursing home was not a medical institution, making its residents eligible to receive public assistance.  *Id.*  At that time, there were about 2,000 nursing home beds in the City.  *Id.*  Over the subsequent twenty years, as the City's aging population grew, welfare departments provided public assistance to an increasing number of nursing home residents; by 1965, the City had licensed 87 private nursing homes containing more than 8,000 beds.  *Id.*

In the 1950s, the State's policy encouraged the opening of private nursing homes.  *Id.* at 384-85.  Converted into nursing homes were buildings that were structurally unsuitable for that purpose.  *Id.*  People with little management training became owners and operators.  *Id.*  Even conscientious management could not deploy sufficiently capable staff members.  *Id.*  Employees of nursing homes often had little or no knowledge of the special needs and vulnerabilities of

11

older adults.  *Id.*  Owners cut corners in providing services to maximize profit.  *Id.*  The City's Department of Hospitals, which still regulated nursing homes, had not evolved with the nursing home industry and could not provide sufficient oversight.  *Id.*  One of the first acts of the new Commissioner of Hospitals in the early 1960s was to begin revision of the nursing home code and to more effectively enforce it.  *Id.*

Senator Robert F. Kennedy asked Dr. Haughton to discuss the city's policy of shutting down nursing homes that were noncompliant with the new code.  *Id.* at 391.  The doctor reported that closures due to noncompliance were generally positive but caused two problems: (1) a deficiency in nursing home beds throughout the city, and (2) the reopening of delinquent nursing homes as "hotels for senior citizens" or "residences for senior citizens."  *Id.* at 391-92.  Twenty-two deficient facilities were found by the Department of Welfare in 1964 to be unsupervised; only "a few of them were doing what they purported to do"—provide room, board, and "personal care."  *Id*. at 392.  Then, as now, the definition of "personal care" varied.  *Id.* (describing the Department of Welfare's definition of "personal care" as "room and board and help with moving about and dressing, if necessary").  The problems the City was attempting to remedy by cracking down on negligent nursing homes reemerged in disguise.

The Department of Welfare found that these repurposed nursing homes were housing as many as 600 individuals in buildings rife with fire hazards, staffed by uninformed employees, and lacking adequate safety and mobility precautions.  *Id.*  Dr. Haughton described a scenario in one such home in which a frail, completely deaf woman was housed on the seventh floor of a building.  *Id.*  She could never have heard a fire alarm, and not enough staff members were employed to help her in the event of a fire.  *Id.*  He described another home that housed wheelchair-bounds residents on the upper floors of a building in which the elevator was too

12

small for wheelchairs.  *Id.*  Deficiencies such as these, Dr. Haughton reported, could be fatal to residents.  *Id.* at 393; *see also* Statement of Ray E. Trussell, Director, Columbia University School of Public Health and Administrative Medicine, at 408 (describing a "hotel for senior citizens," which lacked fire safety protocol, and had a fire, and in which a patient was burned to death).

The Subcommittee took testimony from Irwin Karassik, an attorney who was then the executive director of the Metropolitan New York Nursing Home Association.  *See id.* at 395 (statement of Irwin R. Karassik, Executive Director, Metropolitan N.Y. Nursing Home Assoc.).  Accompanying Karassik to the hearing was Eugene Hollander, then the President of the Metropolitan New York Nursing Home Association.  Hollander would, nearly a decade later, plead guilty to various state and federal charges of Medicare and Medicaid fraud and be sentenced to a term of incarceration.  S*ee* Part III.C.2, *infra*.  Karassik would, also nearly a decade later, be indicted for second degree criminal solicitation.  *See Matter of Hynes v. Karassik*, 47 N.Y.2d 659, 661 (1979).  It was alleged that Karassik had counseled a client to deny before a Grand Jury that he had paid $5,000 to expedite approval of one of his nursing home establishments; he was acquitted by a jury.  *Id.*

The Metropolitan New York Nursing Home Association represented 67 out of the City's 87 licensed, proprietary nursing homes—7,700 out of the 8,800 beds.  *See* Subcomm. Hr'g at 395.  Karassik noted that his association did not represent any of the 22 unregulated "hotels" or "residences" for seniors that Dr. Haughton described.  *Id.*  Notable in Karassik's testimony was his disapproval of the City's new nursing home code.  *Id.* at 397.  He took issue with the new code's stringent physical plant standards.  *Id.*; *see also* Part III.E.2, *infra* (describing recent

13

litigation contesting, among other things, physical structure requirements in the State's Assisted Living Reform Act of 2004).

Karassik argued that "[p]hysical structure . . . is not necessarily equated to standards of nursing care." *Id.* at 397 (describing physical plant requirements including: hallways at least six feet wide; floor area in a single bedroom at least 100 square feet; elevators in buildings more than one story high; doorways at least three and a half feet wide; installation of exercise rooms, additional entrances, entrance ramps, additional toilet, bathroom, and shower facilities; modification of room arrangements; provision of additional space for dining and storage facilities; and assigning space for treatment and examination rooms).

Under the previous version of the code, nursing homes constructed prior to 1954 were exempt from the physical plant requirements by a grandfather clause. *Id.*  The code was eventually amended to include these older facilities. *Id.*  Karassik argued that purchasers of pre-1954 nursing homes, who relied on the grandfather clause to comply with code requirements, would lose their investments. *Id.*  He also claimed that compliance with strict, allegedly "arbitrary" construction requirements was "impossible, as a physical matter, for some . . . and would involve others in impossibly exorbitant expenses together with loss of income." *Id.*

Hollander agreed with Karassik that the lack of nursing home construction and improvement in New York City was "directly attributable" to the "luxurious but impractical spatial requirements" of the new code. *Id.* at 399.   Karassik claimed to take no issue with the non-structural requirements of the new code, and he reported that the time had come for the federal government to impose national standards for nursing homes. *Id.* at 401-02.  "We are not fighting progress," claimed Hollander. *Id.* at 402.

Ray E. Trussell, then the Director of Columbia University's School of Public Health and Administrative Medicine, and previously New York City's Commissioner of Hospitals and Executive Director of the Mayor's Commission on Health Services, explained the need for improvements in facilities and standards of care in the City's nursing homes. *See id.* at 408 (statement of Ray E. Trussell, Director, Columbia University School of Public Health and Administrative Medicine). Trussell described an audit by the a mayoral commission and the City's closing of substandard nursing homes. *Id.* He reported that the City had upgraded training for nursing home administrators and developed a program for a local television station to assist in training nursing home aides and attendants. *Id.* The City increased special investigative staff in order to conduct monthly investigations of facilities. *Id.*; *see also id.* at 412-16 (describing in detail all developments in the City's proprietary nursing home program between 1961 and 1964).

Jean Wallace Carey, an expert on aging at the Department of Public Affairs' Community Service Society, spoke of the need for community integrated services for older adults, individualization in long-term care decisions for older adults, and the importance of noninstitutional care for older adults. *Id.* at 484-91 (statement of Jean Wallace Carey, staff associate for aging, Community Service Society, N.Y.C. Department of Public Affairs). Carey argued that the slowdown of nursing home construction in New York and the prevalence of substandard conditions—as well as social desirability—strongly favored keeping older adults in their homes and communities for as long as possible. *Id.* at 484. Carey argued that patient care and appropriate living arrangements should be determined according to actual patient need—not by the availability or unavailability of nursing home beds. *Id.* Compared to relocating to a

nursing home, community-based long-term care services would also keep costs for older adults low. *Id.* at 485.

Future Mayor Lindsay provided his recommendations for developing and improving nursing home facilities and standards of care in the City. *Id.* at 502-03; *see also id.* (elaborating further on Lindsay's recommendations). First, he suggested that each of the city's private hospitals aim, by 1972, to add an additional 100 beds, devoted to nursing home care, to their facility. *Id.* at 502. He argued that this would relieve some of the City's shortage of nursing home beds. *Id.* He recommended that the Medicare Act be revised to allow older adults to move straight into a nursing home—rather than being first admitted to a hospital and then relocating to a nursing home. *Id.* He also suggested that the City extend the 100-day maximum for nursing home stays related to a single illness. *Id.* Lindsay argued that Medicare and welfare patients should be compensated for nursing home care based on a sliding scale of services received—not according to fixed rates. *Id.* Finally, he recommended that the Department of Health, Education, and Welfare (now the Department of Health and Human Services) intensify its research into long-term care providers' needs for personnel, training and facilities. *Id.*

The Subcommittee hearings concluded by reiterating the importance of ensuring that nursing home patients are not treated as "the living dead" with medical conditions to be treated and disregarded, but as individuals with social, psychological and emotional needs. *Id.* at 581-82. It was urged that nursing homes be more cognizant of the fact that "an individual is more than an ache and a temperature and blood pressure but is a human being." *Id.* at 581 (statement of Herbert Shore, President, American Association of Homes for the Aging).

### 2.     New York Nursing Home Scandal of the 1970s

In December 1974, eighteen members of New York State's congressional delegation appealed to Governor-elect Hugh Carey to assemble a special commission (the "Moreland

16

Commission") to investigate the State's nursing home industry.  *See* John L. Hess, *18 State Congressmen Ask Carey to Start a Nursing Home Inquiry*, N.Y. Times, Dec. 18, 1974, at 1 [hereinafter *Congressmen Ask for Inquiry*].

The Congressmen's appeal came after a limited audit of the industry revealed evidence of inadequate supervision by the State's Department of Health of nursing homes' Medicare and Medicaid receipts.  *See* John L. Hess, *State Audit Finds Wide Overbilling By Nursing Homes*, N.Y. Times, Sept. 6, 1974, at 1.  The State audited the billings of 58 nursing homes for the years 1969 and 1970, uncovering millions of dollars in unwarranted Medicaid claims—money that nursing home operators spent on personal servants, yachts, family cars, fine art, vacations, jewelry, department store accounts, and nursery school and college tuition for their children.  *Id.* Evidence emerged of millions of dollars' worth of financial irregularities at nursing homes.  *Id.*

A separate crash inspection of 104 private nursing homes in 1973 found a variety of deficiencies ranging from "neglect of care . . . to utter abandon."  *Id.*  Several nursing homes on Manhattan's Upper West Side—former hotels or apartment buildings with narrow hallways, doorways, and tiny elevators—were inspected earlier in 1974 and found to be non-compliant with regulations.  *Id.*  Although bulletin boards displayed schedules of activity, patients did not read, talk, play games, or interact—a television set was often their only source of stimulation. *Id.*  Plumbing leaked; therapy and treatment rooms were unused; and patients who entered homes in relatively good health became senile rapidly due to neglect and inactivity.  *Id.*

An investigation of Florence Nightingale Nursing Home, owned by one Charles Sigety, found dozens of infractions uncorrected since a prior visit, including filthy kitchens, lack of patient recreation, fire hazards, and inadequate nursing staff.  *See, e.g.*, Jack Newfield, *The Latest Nursing Home Scandal: The Sigety Cover-Up*, Village Voice, Jan. 13, 1975, at 14.  Nevertheless,

he was authorized to open a second nursing home.  *Id.*  Disconcerting to members of Congress were allegations by the press that nursing homes in New York were connected to organized crime and were being used to launder money.  *See* John L. Hess, *Homes for Aged Linked to Crime*, N.Y. Times, Dec. 25, 1974, at 1.

Suggested was that excessive, fraudulent Medicare and Medicaid billings could not have occurred without "underworld ties and political protection."  *Id.*  Federal agencies had taken an interest in investments by Meyer Lansky, a notorious underworld figure, in nursing homes in Western New York.  *Id.*  And authorities were investigating joint ventures between Bergman and Joseph Kosow, a major Boston financier of nursing homes, who had been convicted of stock fraud.  *Id.*

Nursing home operators responded to these charges by claiming that they performed necessary, worthwhile services at low cost and little profit; they claimed victimization by "malevolent propaganda."  *Congressmen Ask for Inquiry*, *supra*, at 34; *see also* John L. Hess, *Ex-Aide Says Association Hid Nursing Home Abuses*, N.Y. Times, Feb. 1, 1975, at 1 [hereinafter *Association Hid Abuses*] (describing testimony by a former Vice-President of the Metropolitan New York Nursing Home Association, Nicholas Demisay, claiming that the organization had actively covered up financial fraud and patient abuse in the nursing homes it represented).

The Moreland Commission on Nursing Homes officially concluded its work in February 1976.  *See generally* Morris B. Abram, New York State Moreland Commission Act Report on Nursing Homes and Residential Facilities, Vol. 1-7 (1976); *see also* John L. Hess, *Moreland Report of Nursing Homes Cites Rockefeller*, N.Y. Times, Feb. 26, 1976, at 1 [hereinafter, *Moreland Report Cites Rockefeller*].  The Commission's 218-page report laid substantial blame on former Governor Rockefeller for the "political influence, official neglect, and poor care that .

18

. . were rife in the industry while he was Governor." *Moreland Report Cites Rockefeller*, *supra*, at 1, 61.

More than a dozen major political figures—including former State Attorney General Lefkowitz, former Governor Malcolm Wilson, former Assembly Speaker Stanley Steingut, and former Mayor Lindsay—were cited for "interference, negligence, or impropriety." *Id.* at 1; *see also* Amitai Etzioni, *Medicaid Woes: Exposé is Not Reform*, New York Magazine, Jan. 10, 1977, at 6-7 (recognizing that exposing corruption will not end it; suggesting industry reforms including increasing political representation for nursing home patients and Medicaid clients; the creation of a permanent watchdog commission; jail sentences of at least one year for all convicted nursing home abusers; personal liability for gross negligence by owners and administrators of nursing homes and Medicaid clinics; disqualification from Medicaid for unscrupulous owners and administrators; research to determine which Medicaid-sponsored facilities, if any, should be allowed to run as for-profit institutions).

In 1975, Charles J. Hynes was named the City's special prosecutor for nursing homes and tasked with prosecuting the "'literally thousands of instances of larceny or worse'" that the Commission uncovered. *Moreland Report Cites Rockefeller*, *supra*, (quoting from a press conference by Morris B. Abram, the Commission chairman). Hynes's Medicaid Fraud Control Unit attacked Medicare and Medicaid fraud throughout the City. *See, e.g.*, John L. Hess, *Battles Are Shaping Up Over Nursing Homes as Operators Threaten to Refuse Added Patients*, Nov. 12, 1975, at 40. Financial crimes against nursing homes and taxpayers were inextricable from abuse and neglect perpetrated against nursing home patients.

High-profile prosecutions of nursing home operators were carried out against individual owners. *See* John L. Hess, *U.S. and State Indict Hollander on Nursing-Home Fraud Charges*,

N.Y. Times, July 3, 1975, at 1, 12.  A number pled guilty, receiving heavy fines and jail

sentences as well as orders to leave the nursing home industry.  *See*, *e.g.*, John L. Hess,

*Enforcing Nursing Home Convictions*, N.Y. Times, Feb. 5, 1976, at 40; Tr. of Sentencing H'rg,

*U.S. v. Hollander*, 75-CR-525, E.D.N.Y., May 5, 1976, 1976, Op. NB # 6, at 215.

 Since the 1960s and 70s, the long-term care industry has evolved for the better.  *See* Parts

III.D and III.E, *infra*.  Older adults may now choose from a wide range of types of facilities,

providing varying levels of support.  Standards of care are higher.  Facilities must be licensed

and are subject to demanding inspections.  The public is now better-informed about problems

facing older adults who choose to enter a nursing home or long-term care facility.

 **D.  Rise of the Assisted Living Residence**

 Pressure for nursing homes, assisted living residences, and subsidized home care for the

elderly continues to rise.  By the year 2030, 19% of the population—72.1 million Americans—

are likely to be over the age of 65.  *See generally* U.S. Dep't. of Health and Human Servs.

Admin. on Aging, *Aging Statistics*, http://www.aoa.gov/AoARoot/Aging_Statistics/index.aspx.

It is estimated that by 2030 in New York State alone, nearly four million people will be over the

age of 65, and 621,771 people will be over 85; older adults will comprise nearly one-quarter of

the State's population.  U.S. Dep't. of Health and Human Servs. Admin. on Aging, *Projections

of Future Growth of the Older Population, By State: 2005-2030*,

http://www.aoa.gov/AoARoot/Aging_Statistics/future_growth/future_growth.aspx.

 America's "baby boomers" started turning 65 in 2011.  A large swath of the population is

now beginning to retire.  *See generally* William J. Spitzer, et al., *The Coming of Age for Assisted

Living Care: New Options for Senior Housing and Social Work Practice*, 38 Social Work in

Health Care 21, 23 (2004).  Due to advances in medical technology, healthier lifestyles, and a

shift from infectious diseases to chronic illnesses, Americans are living longer.  *Id.*  Still, about

30% of Americans age 65 to 74, and 50% of Americans over the age of 75, suffer from a chronic

condition that limits their mobility and capacity for self-care.  *Id.* (typical conditions include

arthritis, hypertension, hearing/vision/orthopedic impairments, and heart disease); *see also*

Amanda J. Lehning & Michael J. Austin, *Long-Term Care in the United States: Policy Themes

and Promising Practices,* 53 J. Gerontological Soc. Work 43, 46 (2009).

To serve the demands of a rapidly aging population, the adult care industry has swiftly

grown and evolved over the past twenty-five years.  Resulting is a large variety of long-term,

adult care options including state- and federally-regulated hospices; federally-regulated nursing

homes; federally-regulated Medicare and Medicaid programs; and the type of facility at issue

here, state-regulated assisted living residences.  *See generally* Admin. on Aging, *supra*; N.Y.

Office for the Aging, *supra*.

Changing demographics, increased mobility, and women's advancement in the workforce

have resulted in fewer family-based settings available to older adults.  Bruce, *supra*, at 67;

Spitzer, *supra*, at 24.  *See also* Ann Bookman and Delia Kimbrel, *Families and Elder Care in the

Twenty-First Century*, 21 The Future of Children 117, 118 (2011).  Older adults who cannot live

independently and cannot live with a family caretaker are increasingly left with no alternatives to

nursing homes.  They need a place to go, and the ALR has developed to meet this need.  Much of

the burden for housing America's older adults—those not requiring constant medical attention or

nursing care—will fall on ALRs.  Bruce, *supra*, at 67.

Influenced by Europe's emphasis on independent, non-institutional housing alternatives

for the frail and elderly, the assisted living market in America developed out of consumer

demand for an "intermediate level of services, more supportive than an individual home but less

restrictive than a nursing home."  Spitzer, *supra*, at 26; Jane Bello Burke, *Assisted Living in New York: Old and Broke, Where Will We Go from Here?*, 12 Health L. J. 35, 35 (2007).

The United States spent $207 billion on long-term care in 2005, a quadrupling from 1980. Lehning & Austin, *supra*, at 47.  Experts expect long-term costs to quadruple again by 2050.  *Id.* Researchers in social work, public policy, and the law agree that keeping down the cost of assisted living facilities and ensuring that middle- and low-income individuals have access to assisted living care must be priorities.  *See, e.g.*, Spitzer, *supra*, at 37; Lehning & Austin, *supra*, at 47; Mauro Hernandez, *Assisted Living in All of Its Guises*, 29 Generations 16, 16 (2005-2006). Although care in an ALR is less expensive than care in a nursing home, the costs can still be prohibitive. *See, e.g.*, Victor Regnier, *The Definition and Evolution of Assisted Living within a Changing System of Long-Term Care*, *in* Aging, Autonomy, and Architecture: Advances in Assisted Living 3, 12 (Benyamin Schwarz ed., 1999).

Residents of ALRs tend to pay their fees with private funds, while nursing home residents rely mainly on Medicaid and Medicare funds.  Bruce, *supra*, at 69-70.  Medicare does not cover the cost of assisted living, but low-income individuals may use Medicaid toward their residence in a nursing home; in New York, Medicaid does not cover ALR costs.  Bello Burke, *supra*, at 37 ("Nationally, New York is in the minority of states that do not cover assisted living under their Medicaid programs.").  Residents must pay for an ALR out-of-pocket and, often, after spending down their savings, transfer to a nursing home in order to utilize Medicaid funds. *Id.*  Studies show that this type of relocation has adverse physiological and psychological effects. *See, e.g.*, Rosemary Chapin & Debra Dobbs-Kepper, *Aging in Place in Assisted Living: Philosophy Versus Policy*, 41 Gerontologist 43, 44 (2001).  The result is that only more affluent older adults can age-in-place in an ALR.  *See* Bello Burke, *supra*, at 37.  The Health Insurance

Association of America reported that some dozen insurance companies now include assisted

living facilities in their long-term care insurance packages.  Spitzer, *supra*, at 26 (citing S.

Coronel, Health Insurance Association of America, *Long-Term Care Insurance in 1997-98*

(2000)).

      In an attempt to keep costs of long-term care under control, New York has established the

Assisted Living Program (ALP), an arrangement that enables individuals who are eligible for

nursing home care to receive Medicaid-funded assisted living services in a low-intensity setting.

N.Y. State Dep't. of Health, *Consumer Guide to Community-Based Long-Term Care: Assisted*

*Living Program*, *available at*

http://www.health.ny.gov/health_care/medicaid/program/longterm/alps.htm.

      To be eligible for placement in the ALP, a potential resident who is Medicaid funded or

privately paying must require assisted living due to lack of a suitable home environment.  *Id.*

The resident must not, however, require continual nursing care, be wheelchair-bound or

bedbound, or be so incapacitated as to endanger the safety of other ALP participants.  *See* Bello

Burke, *supra*, at 47.  The program's requirements have been described as too restrictive, and its

size too small, to have a substantial impact on unsatisfied demand.  *Id.*  It is limited to some

4,000 participants.  *Id*.  The ALP does not solve the problem of providing lower-cost or

government-funded assisted living care to middle- and low-income individuals who need a

supportive environment, but who are not yet eligible for nursing home care.  *Id*.

      The ALR market initially operated without government regulation.  As the number of

ALRs has grown, more states have imposed regulations.  *Id.; see also* Lydia L. Ogden and

Kathleen Adams*, Poorhouse to Warehouse: Institutional Long-Term Care in the United States*,

38 Publius 138, 140 (2009).  Regulatory schemes and formal definitions of ALRs vary from state

to state, but they have similar elements: an ALR provides twenty-four hour supervision in a

residential setting, scheduled and unscheduled assistance, three meals per day, housekeeping,

social activities, and assistance with eating, bathing, dressing, walking, toileting, and hygiene.

Assisted Living Fed'n. of Am., *Assisted Living Information*,

http://www.alfa.org/alfa/Assisted_Living_Information.asp.

      An older adult who requires constant medical attention or nursing care would not be

eligible for residence in an ALR.  *Id*.  *See also* N.Y. Pub. Health L. § 4651(15).  But ALRs can

be certified to allow residents to age-in-place—*i.e.*, receive nursing and medical care in their

current residence as they become frailer; this keeps older adults from being forced to relocate

from an ALR to a nursing home, hospital, or hospice when their health or mobility deteriorates.

      ALRs are expected to provide older adults with an independent, dignified, and

autonomous existence.  The buildings are typically constructed and designed to emphasize the

residential—rather than medical—services provided.  Spitzer, *supra*, at 26.  Residents rent

private rooms or shared apartments equipped with kitchenettes, full bathrooms and locking

doors.  *Id*.  ALRs are designed with non-institutional décor.  *Id.*  They often feature fitness

centers, libraries, hairdressers, computer rooms, and other services for residents' use.  *Id.*

      The typical ALR resident is an 87 year old female widow.  *See* Assisted Living Fed'n. of

America, Position Paper,

http://www.alfa.org/images/alfa/PDFs/Public_Policy_Position_Papers/Assisted_Living_Position

_paper.pdf.  She stays at the ALR for an average of 28 months and has an average annual income

of $27,600.  *Id.*

### E.  Assisted Living Residences in New York State

Emphasizing a philosophy of independence, autonomy, dignity, choice, and privacy for residents, New York has defined an ALR as "an entity which provides or arranges for housing, on-site monitoring, and personal care services and/or home care services . . . to five or more adult residents."  N.Y. Pub. Health L. § 4651; *see also* Part III.B, *supra*.  This definition is standard throughout the country.  *See generally* Stephanie Edelstein & Karen Gaddy, American Association of Retired Peoples Public Policy Institute, *Assisted Living: Summary of State Statutes, Three Volumes* (2000), *available at* http://assets.aarp.org/rgcenter/post-import/d17145_assisted_vol3.pdf.

An ALR in New York must provide "daily food service, twenty-four hour on-site monitoring, case management services, and the development of an individualized service plan for each resident."  N.Y. Pub. Health L. § 4651(1).  These services must be rendered in the least restrictive manner and the most home-like setting, commensurate with residents' preferences, desires and capabilities.  *Id*.

As in most states, a typical ALR resident in New York does not require around-the-clock care.  *See generally* Empire State Ass'n. of Assisted Living, *Information About Adult Care Facilities and Assisted Living Residences* 5, http://www.esaal.org/pdf/NYConnectsGuide.pdf.

### 1.    New York State Assisted Living Reform Act of 2004

The assisted living industry in New York—as it pertains to residences inhabited by older adults who do not require continuous nursing care—was unregulated until the early 2000s.  *See* Sponsor's Mem. Bill Jacket, 2004 S.B. 7748, ch. 2 (Oct. 26, 2004).  The result was unacceptable: facilities provided inconsistent quality of care and received little or no oversight or regulation. *See* Long-Term Care Community Coalition*, supra.*  Because no scheme existed to define various types of facilities and to prescribe what services they must provide, facilities could hold

themselves out as an "assisted living residence," "adult home," "long-term care facility," or "retirement community" with no interference by the state.  *Id.*

New York State's long-term care industry was, as already noted, once plagued by poor conditions, financial corruption, and mistreatment of residents.  *See generally* Parts III.A-C, *supra*; Charles J. Hynes, Deputy Attorney General, *Private Proprietary Homes for Adults* (March 31, 1979); New York City Council Subcommittee on Adult Homes, *The Adult Home Industry: A Preliminary Report, Summary of Preliminary Findings* (1979); Long-Term Care Community Coalition at 14.  Many of these problems affected "impacted" adult homes: adult care facilities in which more than 25% of residents suffer from mental illness.

Public Health Law Article 46-B, the Assisted Living Reform Act (the ALR Act) was enacted in 2004 with the express purpose of protecting consumers of assisted living services. N.Y. Pub. Health Law Article 46-B, Title 1, §4650. The statute aims to:

> create a clear and flexible statutory structure for assisted living that provides a definition of assisted living residence; that requires licensure of that residence; that requires a written residency agreement that contains consumer protections; that enunciates and protects resident rights; and that provides adequate and accurate information for consumers, which is essential to the continued development of a viable market for assisted living.

*Id*.  The state legislature found that "congregate residential housing with supportive services in a home-like setting, commonly known as assisted living, is an integral part of the continuum of long-term care." *Id.*

The Assisted Living Reform Act attempted to provide a concrete definition of assisted living, establishing a regulatory, registration, and certification program for facilities wishing to call themselves ALRs, and creating the mechanism for State regulation.  *See* Sponsor's Mem. Bill Jacket, 2004 S.B. 7748, ch. 2 (Oct. 26, 2004) (budget report).  *See also* Ombudsman Program, Part III.E.4, *infra*.  Legislators who proposed the bill argued that the then-200

residences in New York that, in 2004, offered assisted living services were not sufficiently

regulated to address aging-in-place and special needs—*e.g.*, Alzheimer's and dementia.  *See*

Sponsor's Mem. Bill Jacket, 2004 S.B. 7748, ch. 2 (Oct. 26, 2004) (budget report).

 The standards and disclosures that the proposed Act would require were intended to aid

consumers in comparing ALRs and making informed decisions about long-term care.  *Id*.  Goals

included to "clarify, improve, and standardize business practices" in the ALR industry and to

allow legitimate ALRs to hold themselves out as meeting State standards in order to provide

services, while stopping unlicensed ALRs from doing so.  *Id*.  This, legislators hoped, would

empower and protect consumers and their families—and give families confidence when deciding

to move a loved one into an ALR.  *Id*.  ALRs would function more efficiently and effectively, it

was believed, with full knowledge of what the State expects from them.  *Id*.  The argument in

favor of serving one of New York's most vulnerable populations with sufficient state oversight

prevailed.  *Id*.

 The bill was publicly supported by the New York Department of Health, the State Office

for the Aging, the American Association for Retired Persons (AARP), the New York State

Association of Health Care Providers, the Schuyler Center for Analysis and Advocacy, and the

Retired Public Employees Association.  *See* Sponsor's Mem. Bill Jacket, 2004 S.B. 7748, ch. 2

(Oct. 26, 2004).

 The Governor signed the bill in October 2004.  After two periods of public comment, the

Department of Health promulgated rules implementing the statute in 2008.  *See* N.Y. Comp.

Codes R. & Regs. tit. 10, § 1001.1 *et seq.*

## 2. Article 78 Proceeding

 Shortly after the Department of Health promulgated rules under the ALR Act, two trade

associations, the Empire State Association of Assisted Living and the New York Coalition for

Quality Assisted Living, along with a group of individual adult homes, initiated an Article 78 proceeding against the State to stop enforcement.  *See Matter of Empire State Ass'n of Assisted Living, Inc. v. Daines*, 887 N.Y.S. 2d 452, 452 (Sup. Ct. Albany Cnty. 2009).  They argued that, in promulgating the regulations enacting the bill, the Health Commissioner exceeded the authority granted to him by the ALR Act.  *See id*.

Challenged were the regulations: prescribing structural and environmental standards for ALRs; establishing personnel requirements (*i.e.*, full-time nursing staff); governing residents' rights to notice of fee increases; imposing a new schedule of penalties for regulatory violations; limiting ALRs insistence on guarantors of payment; and requiring the Department of Health to pre-approve real estate transactions associated with an ALR facility.  *See id*. at 458-65.  The State argued that each disputed regulation was in the best interests of ALR residents.  *Id*. at 460.  But the provider associations claimed that the Commissioner "transgressed the 'difficult-to-define line between administrative rule-making and legislative policy-making.'"  *Id.* (quoting *Boreali v. Axelrod*, 71 N.Y.2d 1, 9 (1987)).

The court granted nearly all of the industry's requests.  *See id*. at 458-65.  It nullified the structural and environmental standards imposed by the Commissioner, holding that they exceeded the legislative mandate of the Act, were duplicative of the initial adult care facility licensure process, and were unduly financially burdensome.  *Id*. at 460.  It held that the requirements for ALRs to maintain full-time nursing staff had no rational relation to the actual needs of residents.  The law requires ALRs to devise individualized service plans for each resident.  *Id.*  Because not all residents require full-time nursing care, it was held that the regulatory requirement of full-time nursing staff would have prohibitively increased costs and

contravened the Act's purpose of making ALRs accessible to low- and middle-income individuals.  *Id*. at 462.

The decision abrogated a requirement of forty-five days' written notice of any fee increase, holding that the requirement imposed conditions never contemplated by the legislature. *Id*.  It also nullified the regulation granting the Commissioner the power to restrict real estate transactions relating to ALRs, holding that the Commissioner's control over the alienability of property is distinct from his legitimate power to inquire into an ALR's financial affairs and was thus an overextension of his authority.  *Id*. at 464.

Upheld were some key consumer protection regulations.  The schedule of penalties promulgated by the Commissioner was held to be sufficiently related to the original schedule of penalties.  *Id*. at 463.  And the court upheld the regulation restricting ALRs from requiring guarantors on payment, citing the statute's assertion that residents have control over their own financial affairs.  *Id*.

Aside from the changes imposed by the 2009 litigation, the ALR Act and its rules remain intact.  Apparently no appeal was prosecuted by the state.

### 3.    Statutory Purpose and Regulatory Enforcement of the ALR Act

The ALR Act and regulations established a complex statutory and regulatory scheme to ensure that: (1) an ALR cannot hold itself out as a facility that provides services it is not legally authorized to provide; (2) ALRs abide by the State's multi-tiered licensing requirements so that the State knows precisely what services an ALR is authorized to provide; and (3) ALRs are routinely inspected and found actually to be providing the services they are licensed to provide. *See generally* N.Y. Pub. Health Law Article 46-B; N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.1-.16.

In order to call itself an ALR, a facility must first be certified by the State as an *adult home* or an *enriched housing program*.  N.Y. Pub. Health L. § 4653.  It may simultaneously apply for both certifications.  N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5.  An *adult home* provides long-term residential care, room, board, housekeeping, personal care, and supervision to five or more adults of any age, unrelated to the operator.  Long-Term Care Community Coalition, *supra*, at 48.  An *enriched housing program* does the same, but in "community integrated settings resembling independent housing units"; it must also provide room, board, housekeeping, personal care, and supervision.  *Id*.

The statute requires that the facility submit its business name, street address, owners' mailing address, and status of current operating certificate to the State's Health Commissioner. N.Y. Pub. Health L. § 4653.  It must verify that it has entered into a valid residency agreement with each resident, resident's representative, or resident's legal representative and produce the information it includes in its resident agreements.  *Id*.

Regulations promulgated by the Department of Health provide exhaustive requirements for ALR licensure, most of which mirror Title 18, Chapter II, Subchapter D of the New York Regulations, which governs adult care facilities that fall under the purview of the Department of Social Services.  *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5; N.Y. Comp. Codes R. & Regs. tit. 19, §§ 485.1-485.17 (regulating adult care facilities, including adult homes, enriched housing programs, residences and shelters for adults, family-type homes, public homes for adults, and private proprietary adult care facilities).  The process, briefly, is as follows.

An ALR must submit its application for a license on forms supplied by the Department of Health.  N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5(d).  If the facility is a corporate entity, the application must be subscribed by a CEO, managing member, or general partner or

proprietor; if it is a local governmental entity, the president or chairman of the board must have subscribed the application. *Id*. A certified copy of the board's resolution to undertake licensure must be included. *Id*. The applicant must prove that it has been licensed as an adult home or enriched housing program—or that it is simultaneously applying for both licenses—and that it is in good standing with the Department. N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5(e)(2). If the applicant is not in good standing, it must prove that it is of good moral character and competent to operate the facility; the Department may approve a facility at its discretion. N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5(e)(2)(v).

Generally, the application requires a facility to submit information regarding its financial resources and sources of future revenue, the fitness and adequacy of its premises and equipment, a plan for administration, a list of services to be offered, and the provision of required consumer information. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(1-5). It must provide full documentation, including its certificate of doing business, evidence of site control (a deed, lease, or use agreement), management or consultant agreements, and copies of partnership agreements. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(6)(i-iv).

If the facility is a corporation, it must submit its certificate of incorporation, the corporation's bylaws, affidavits from each shareholder that he or she is the sole beneficial owner of his or her shares, the number of outstanding (not issued) shares, a statement that shares are not traded on a national securities market and that no stock of the corporation is owned by another corporation, stock certificates of the corporation stating that ownership of shares and voting rights in the corporation, as well as transfers, assignments, or disposition of shares must be approved by the Department. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(6)(v)(a-c),

(vi)(a-d); *see also* N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(6)(vii)(a-c) (limited liability corporations).

Business corporations, limited liability corporations, not-for-profit corporations, or general partnerships must submit information identifying all officers, directors, stockholders, managers, members, or partners and all information pertaining to all agreements, operating agreements, and partnership agreements. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(6)(vii)(e-h). When a limited liability corporation is to be managed by non-members, the applicant must certify that the following duties are reserved to members only: direct independent authority for appointment and dismissal of the facility's administrator and all staff; approval of facility operating budgets and capital budgets; independent control of all books and records; adoption or approval of facility operating policies and procedures and policies affecting delivery of services; authority over disposition of assets; authority to incur liabilities not associated with day-to-day operations; approval of debts necessary to finance compliance with laws; approval of contracts; approval of settlements of administrative proceedings or litigation to which the facility is a party. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(6)(vii)(h)(3)(j)(1-7).

All facilities must submit information pertaining to the ownership of property interests in the facility—that is, the land, the building, or the equipment—or the ownership of any property interest as a lessor, lessee, or sublessee. N.Y. Comp. Codes R. & Regs. tit. 10, §§ 1001.5(g)(7)(i-vii).

The Department of Health may, at its discretion, request any other information necessary to conduct a full review of the applicant's suitability to operate an ALR. N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5(g)(8).

32

Once a facility is licensed to operate as an ALR, it may apply for further certification as

an Enhanced ALR (EALR) or a Special Needs ALR (SNALR). N.Y. Pub. Health L. § 4655.

EALRs provide more significant nursing care (*i.e.*, vital signs, eye drops, injections, catheter

care, colostomy care, wound care, etc.) than do basic ALRs. State of N.Y. Dep't. of Health,

*supra*, at 6. They are authorized to provide aging-in-place care, which allows residents to

remain in their current residence as they become frailer. A resident may require aging-in-place

care if he or she is wheelchair-bound and requires assistance transferring (moving in and out of

the wheelchair), requires physical assistance walking or ascending/descending stairs, depends on

assistance to use medical equipment, or suffers chronic, unmanaged bowel or urinary

incontinence. Long-Term Care Community Coalition, *supra*, at 49.

SNALRs serve residents suffering from Alzheimer's disease or dementia; they offer

specialized programs and they will have made structural and environmental modifications to

their physical plants to serve residents' specific needs. *Id*. at 5-6. SNALR facilities must remain

fixed within a particular area of the facility. N.Y. Comp. Codes R. & Regs. tit. 10, § 1001.5. A

single facility may devote portions of its building to basic ALR, EALR, and SNALR beds. *Id.*

The Department of Health oversees ALRs' compliance with regulations and standards of

care. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 486.2. It must conduct full, unannounced

inspections of all ALRs at least once every eighteen months. Long-Term Care Community

Coalition, *supra*, at 17. It is required to follow up on resident complaints and conduct further

inspections at its discretion. *Id*. An inspection team—consisting typically of a social worker, a

nurse, an environmental expert, a fire safety expert, and a nutritionist—conducts a walk-through

inspection of the ALR, including residents' rooms; meetings with the operator and/or additional

staff; a review of the facility's fire safety system, meals, menus, and medication distribution;

review of facility, employee, resident, and financial records; and interviews with at least five residents.  *Id*.  An exit interview with staff is conducted.  *Id*.

Incidents of non-compliance are considered either *violations* or *findings*.  *Id*.  A violation is a severe problem that presents risk of harm to residents.  *Id*.  It may reach the level of *endangerment* if it concerns: the failure of an ALR's fire safety system or emergency evacuation protocol; the retention of a resident who requires treatment in a hospital or nursing home but has not been appropriately placed; the ALR's failure to take action regarding a resident's illness, accident, death, or attempted suicide; or the ALR's failure to provide adequate—and statutorily required—levels of staffing.  *Id*.  A finding is less significant than a violation, but, if it is not corrected upon a follow-up inspection, it can become a violation.  *Id*.

ALRs face a variety of potential enforcement actions for non-compliance.  *Id*.  The Department may impose civil penalties after a hearing, revoke or suspend a license, limit the number of residents for which the ALR is authorized to care, stop the admission of new residents, limit the types of services provided, or issue an order requiring a residence to remedy dangerous conditions immediately.  *Id.*  The Department of Health may request that the State Attorney General enjoin operations, request the Attorney General take action to collect civil penalties or seek criminal prosecution, impose civil penalties of up to $1,000 per day for violations that persist after a hearing.  *Id*.

No penalties may be imposed if the ALR demonstrates to the Health Department's satisfaction that violations have been rectified within 30 days of receipt of the written report of the inspection.  *Id*.  Under special circumstances, the Department may still impose penalties if corrected violations endangered or resulted in harm to a resident.  *Id*.

4.    **Ombudsperson Program**

a.  **United States**

Long-term care ombudspersons in the United States follow in the historical tradition—beginning in eighteenth century Sweden—of the ombudsperson as the citizens' representative or protector.  *See generally* Walter Gellhorn, *Ombudsman and Others: Citizens' Protectors in Nine Countries* 194-255 (1967) (describing the position of "citizens' representative," known as ombudsman or various other titles, in Denmark, Finland, New Zealand, Norway, Sweden, former Yugoslavia, Poland, the former Soviet Union, and Japan).

In the United States, ombudspersons work in long-term care, hospitals and medical schools, children's services, and public radio, among other industries.  *See, e.g.*, The National Long-Term Care Ombudsman Resource Center, *available at* http://www.ltcombudsman.org/; Connecticut Office of the Child Advocate, *available at* http://www.ct.gov/oca/site/default.asp; The Mount Sinai School of Medicine Ombuds Office, *available at* http://icahn.mssm.edu/about-us/ombuds-office; National Public Radio Ombudsman, *available at* http://www.npr.org/blogs/ombudsman/.

Many United States counties and cities, including New York City, rely on ombudspersons.  *See, e.g.*, The New York City Public Advocate, *available at* http://pubadvocate.nyc.gov/; The Los Angeles County Office of Ombudsman, *available at* http://ombudsman.lacounty.gov/; State of Hawaii Office of the Ombudsman, *available at* http://www.ombudsman.hawaii.gov/.

In response to nationwide chaos in the nursing home industry, in a 1978 amendment to the Older Americans Act, Congress established the national Long-Term Care Ombudsperson Program.  *See* Part III.C, *supra*; Diane Persson, *The Ombudsman Program: An Overview of the History, Purpose, and Role of Ombudsmen in Long-Term Care Facilities*, 4 J. Am. Med.

35

Directors Assoc. 270 (2002).  Each state was required to establish its own corps of state

ombudspersons—volunteers who identify, investigate, and resolve residents' complaints and

who provide a community presence to long-term care facilities.  Persson, *supra*, at 270.

Across the country, long-term care ombudspersons are trained for anywhere from two

days to ten weeks.  *Id.* at 271.  They study the history of the ombudspersons program; the various

types of long-term care facilities; the biological, social, and psychological effects of aging;

residents' rights and intervention techniques; the intricacies of Medicare and Medicaid; local,

State, and federal regulations governing long-term care facilities.  *Id.*  Ombudspersons take a test

for certification.  *Id.*  They then are placed in facilities for on-site internships.  *Id.*  They are

required to renew their certification annually.  *Id.*

The National Ombudsman Reporting System ("NORS") collects data from

ombudspersons around the country about the types of complaints they encounter.  *Id.*  The

NORS reporting form lists 133 different possible complaints.  *Id.*  The system provides

researchers with comprehensive, meaningful data about the inner workings of a long-term care

facility: the variety of problems faced by residents, the most frequent complaints, percentage of

complaints resolved, and correlations among resident demographics, complaints, and resolution

of complaints.  *Id.*

Professor Walter Gellhorn of Columbia Law School suggested that a national

ombudsman, a governmental watchman in the Swedish model, could serve the United States

well.  *See generally* Walter Gellhorn*, When Americans Complain: Governmental Grievance

Procedures* (1966).

**b.  New York State**

Each State has its own model for implementing its long-term care ombudspersons

program.  New York's Long-Term Care Ombudsman program is operated by the New York

36

State Office of the Aging through local contracting agencies pursuant to the Older Americans

Act.  N.Y. State Office of Long-Term Care, Long-Term Care Ombudsman Program ("N.Y.

LTCOP"), http://www.ltcombudsman.ny.gov/.

New York State's Long-Term Care Ombudsman program oversees 44 ombudsperson

coordinators and over 1,200 trained, volunteer local ombudspersons.  N.Y. LTCOP, *supra*.

Under the ALR Act, ALRs must provide potential residents information about the availability of

Long-Term Care Ombudsmen, as well as their contact information, in conjunction with

marketing materials or residency agreements.  N.Y. Pub. Health L. § 4658.  Each ALR must post

attention-getting posters, so residents are made aware of the ombudsman's services in each

residence.

Ombudspersons visit, and volunteers are assigned to, facilities in response to residents'

complaints.  Persson, *supra*, at 271.  They also independently investigate broader, more

systematic problems affecting residents.  *Id.*  They educate residents, staff, and the public about

residents' rights and generally protect the health, safety, and welfare of residents.  They are

assigned both to State regulated ALRs and federally regulated nursing homes.  *Id.*

Serving as a long-term care ombudsperson is difficult work.  Both professionals and

volunteers are motivated to improve the quality of life for vulnerable, institutionalized people.

*Id.* at 270.  They must have the physical and emotional wherewithal to meet the demands of

being a robust advocate for those who cannot advocate for themselves.  *Id.*  They must commit

time and energy to rigorous training and volunteering obligations.  *Id.*  Clinical social workers

have been described as "among the staunchest advocates of patients' rights and patient

participation in health care decision making at the individual and collective level."  F. Ellen

Netting, et al., *Elder Rights and the Long-Term Care Ombudsman Program*, 40 Social Work 351

(1995) (quoting T. Mizrahi, *The Direction of Patients' Rights in the 1990s: Proceed with Caution*, 17 Social Work 246 (1992)).

Volunteers are required to investigate and report complained-of abuses.  Persson, *supra*, at 273.  Ombudspersons liaise with facility staff to resolve specific resident problems.  *Id.*  When patients or residents complain about an issue—administrative policies, quality of life concerns, problems with other agencies, or neglect, abuse, or exploitation—the ombudsperson provides oversight of the facility.  *Id.*  And ombudspersons are required to follow up with patients, staff, and patients' family members to ensure that the complained-of problems have been resolved.  *Id.*  Experience demonstrates that monitoring of individual residences by ombudspersons leads to increased reporting of abuse and neglect, more verifiable and substantiated complaints, higher sanctions, and better care.  *Id.*

Illustrative of the system is Nassau County's operation.  *See* Family and Children's Association, Ombudservice, *available at* http://www.familyandchildrens.org/ombudservice ("Ombudservice").  Under the direction of a devoted, experienced, New York certified social worker with a Master's degree in Social Work from Columbia University, Nassau County's Ombudsman Program was established more than some 20 years ago.  It has set patterns widely followed.  With funds from the County's Department of Senior Citizens Affairs and the State's Office for the Aging, the Ombudservice, under the direction of its highly respected, licensed social worker, has provided each of over 100 volunteer ombudspersons with 36 hours of training.  *See, e.g.*, Family & Children's: 2011 Stewardship Report 5 (2011), http://www.familyandchildrens.org/assets/userfiles/files/PDFs/2011%20Stewardship%20Report %20FINAL.pdf.  Satisfactory completion of this training leads to certification by the State Office for the Aging and placement in a nursing home, adult home, or ALR.  *Id.*  Volunteer

ombudspersons are supervised by facility staff. *Id.* Continuing in-training service is required through seminars and conferences. *Id.*

Nassau County ombudspersons have been described as especially effective and devoted. In a 1993 study, volunteer ombudspersons in Nassau County reported their biggest motivation for participating was their wanting to advocate for change. Netting, *supra*, at 351 (citing I.L. Nathanson, et al., *Motivation Versus Program Effect on Length of Service: A Study of Four Cohorts of Ombudservice Volunteers*, 19 J. Gerontological Social Work 95-114 (1993)).

Nassau County describes its ombudspersons in its training materials, prepared by its first social worker and leader, as serving the roles of broker, communicator, consultant, educator, facilitator, listener, mediator, observer, planner, problem solver, and trouble shooter." In general, social work literature has identified three types of long-term care ombudspersons: the mediator, the advocate, and the therapeutic supporter. Ombudservice; Persson, *supra*, at 271. The mediator is an independent, nonpartisan arbitrator who works to solve residents' problems from a detached perspective. Persson, *supra*, at 271. The advocate takes a more active approach, championing the rights of residents who may not be able to advocate for themselves or who have had their rights violated. *Id.* The therapeutic supporter provides emotional support, concern, and care. *Id.* Studies show that most ombudspersons serve a combination of these functions, with a major focus on therapeutic support. *Id.*

The first thing that meets the visitor at defendants' facility is a large poster notifying residents and their visitors that the local Long-Term Care Ombudsman is available to help them obtain the services they need.

Assisted living residences are not yet required to employ social workers. Only some ALRs provide residents with access to social workers. *See* Spitzer, *supra*, at 32-33; Noelle

LeCrone Fields, et al., *Resident Transitions to Assisted Living: A Role for Social Workers*, 37 Health & Soc. Work 147, 149 (2012).  The benefits of providing assisted living residents with access to trained, professional social workers is indicated by Nassau County's experience, *supra*, and the success of ombudsperson programs across the country.

Social work scholarship, while limited on the subject of the assisted living industry, supports increased, well-structured integration of the two fields.  *See generally* Lehning, *supra*, at 55 (discussing the lack of social work research into the assisted living industry and the mixed results of the studies that have been conducted; describing tentative, but promising, social work practices in the ALR industry); Spitzer, *supra*, at 32-33 (advocating for further integration of the assisted living industry and the social work field; discussing the lack of gerontological studies in bachelor's- and master's-level social work education; describing the social, psychological, and biological services social workers could provide assisted living residents, enhancing residents' wellbeing and limit facilities' workforce shortages and employee burn-out); Fields, *supra*, at 149 (describing the potentially productive, beneficial relationship between the assisted living industry and the field of social work); Ron K. Feinberg, *The Increasing Need for Social Workers in Assisted Living*, 1 J. Soc. Work in Long-Term Care 9, 9 (2002) (advocating for employment of social workers in assisted living residences); Jeannette Franks, *Social Workers Need to Know More About Assisted Living and Vice Versa* 1 J. Soc. Work in  Long-Term Care 13, 13 (2002) (same).

**IV. Conclusion**

This memorandum and order is issued to assist the parties in briefing and arguing motions for summary judgment and for certification of the proposed class action.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: August 7, 2013
Brooklyn, New York

41

## Appendix: Glossary

**Adult Home:** an adult care facility established and operated to provide long-term, residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator.  *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 487; Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.

**Aging-in-place Care:** care for individuals who wish to remain in their ALR as they become more frail, including those who 1) are chronically wheelchair-bound and require physical assistance in transferring in and out of the chair, 2) require physical assistance to walk, 3) require physical assistance to ascend or descend stairs, 4) are dependent on medical equipment or require assistance from medical personnel, 5) have chronic, unmanaged urinary or bowel incontinence. *See* Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.

**Basic Assisted Living Residence (ALR):** an adult home or enriched housing program that additionally provides 24-hour on-site monitoring and personal care services in a home-like setting to five or more adults unrelated to the operator.  *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 1001; Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.

**Enriched Assisted Living Residence (EALR):** a basic ALR which has been certified to provide aging-in-place care—the ability to retain residents who wish to remain in the facility as they become frailer.  *See* Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.

**Enriched Housing Program:** an adult care facility established and operated to providing long-term, residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator, typically persons 65 years of age or older, in community-integrated housing units.  *See* N.Y. Comp. Codes R. & Regs. tit. 10, § 488; Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.

**Instrumental Activities of Daily Living:** dressing, preparing meals, taking medication, using the toilet, managing finances, personal hygiene, arranging doctor's appointments, walking outside, among other activities.  *See* Empire State Ass'n. of Assisted Living, *Information About Adult Care Facilities and Assisted Living Residences* 5, *available at* http://www.esaal.org/pdf/NYConnectsGuide.pdf

**Nursing Home:** a facility that houses individuals who do not need to be in a hospital but can no longer care for themselves at home, provides 24-hour nursing aides or skilled nurses, and provides medical care, speech, physical, and occupational therapy.  A nursing home provides a more intense level of care than an ALR.  *See* "Nursing Homes," U.S. National Library of Medicine, National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/nursinghomes.html.

**Residence for adults:** an ALR that typically serves a younger population with a different array of needs.  Required services include mental health services, room, meals, housekeeping, case management, and 24-hour supervision, but not personal care.  *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 490.

**Special Needs Assisted Living Residence (SNALR):** a basic ALR which has been certified to provide services to individuals with special needs relating to Alzheimer's and other forms of dementia.  *See* Assisted Living Fed'n. of America; Long-Term Care Community Coalition, *Care and Oversight of Assisted Living in New York State* 48, *available at* http://www.ltccc.org/publications/documents/assistedlivingreportMay26a.pdf.  *See also* Part II.B, *supra*.