UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAMUEL BOYKIN, as administrator of the Estate of JOHN L. PHILLIPS, MELVIN DOZIER and KELVIN DOZIER, as Co-Guardians of IRENE DOZIER, an Incapacitated Person, and GEORGIA LEVIS as administrator of the Estate of MARY JOAN BARNETT, Individually and on behalf of all others similarly situated, | **MEMORANDUM, ORDER, AND JUDGMENT** |
| Plaintiffs, | 12-CV-6243 |
| – against – | |
| 1 PROSPECT PARK ALF, LLC, PROSPECT PARK RESIDENCE HOME HEALTH CARE, INC., PROSPECT PARK RESIDENCE LLC, KOHL ASSET MANAGEMENT, INC., and KOHL PARTNERS, LLC | |
| Defendants. | |



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 2 3 2014 ★

BROOKLYN OFFICE

**Appearances:**

For Plaintiffs:      Hunter Shkolnik and Brian Howard Brick
Napoli Bern Ripka Shkolnik, LLP
New York, NY

John O'Hara
Law Office of Dennis Kelly
Glen Head, NY

For Defendants:     Joel A. Drucker
Randolph, NJ

Kenneth McLellan and Keith R.M. Roussel
Winget, Spadafora & Schwartzberg, LLP
New York, NY

**JACK B. WEINSTEIN, Senior United States District Judge:**

### Table of Contents

I.   Introduction ...................................................................................................................2



1

II.   Facts ........................................................................................................................4

III.  Procedural History ................................................................................................9

     A.     State Court Proceedings.......................................................................9

     B.     Federal Court Proceedings.................................................................11

IV.  Summary Judgement ...........................................................................................12

V.   Article 46-B / Section 2801-d Claim ..................................................................12

     A.     Law .....................................................................................................12

     B.     Application of Law to Facts ................................................................14

VI.  Other State Claims..............................................................................................18

     A.     Law .....................................................................................................18

     B.     Application of Law to Facts ................................................................19

VII. Federal Claims ...................................................................................................26

     A.     Law     .........................................................................................26

            1.     RICO ......................................................................................26

            2.     Section 1983 / FNHRA ...........................................................28

     B.     Application of Law to Facts ................................................................29

            1.     RICO ......................................................................................29

            2.     Section 1983 / FNHRA ...........................................................31

VIII.  Class Certification ...........................................................................................32

IX.  Conclusion...........................................................................................................33

**I.**     **Introduction**

Named plaintiffs are the legal representatives of three former residents of Prospect Park Residence ("the Residence"), an assisted living facility located in Brooklyn. The Residence is a high-rise, well maintained building near the Central Public Library, Brooklyn Museum, Brooklyn Botanic Gardens, Prospect Park, good public transportation, and other amenities. *See* Minute Entry, May 28, 2013, ECF No. 35 (describing court visit to the Residence).

Sought are money damages for the named plaintiffs and on behalf of a putative class. Defendants either have an ownership stake in, or manage, the Residence.

Claimed is that defendants in a common course of conduct intentionally misrepresented that the facility was a licensed Assisted Living Residence under New York law from 2006 to 2012. No such license was acquired until November 30, 2012, when the New York State Department of Health conditionally approved the Residence's Assisted Living Residence license application.

No evidence has been offered of a material difference in the quality of services offered by the Residence as compared to what a similarly-situated licensed facility would have provided. Nevertheless, plaintiffs seek damages for the difference between the amounts they paid at the Residence and the amounts they would have paid if they had known that the Residence lacked a license. There is no evidence that a comparable licensed assisted living residence was available during the relevant period.

Several causes of action rooted in defendants' alleged wrongdoing with respect to the facility's licensing status are asserted. Federal questions are presented by a claim pursuant to the civil cause of action in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and a 42 U.S.C. § 1983 claim alleging a deprivation of a right created by the Federal Nursing Home Reform Amendments (FNHRA), 42 U.S.C. §§ 1395i-3, 1396r. Am. Compl. ¶¶ 164-87, June 14, 2013, ECF No. 36. Other claims are based upon common law and statutory rights under New York State law. *Id.* ¶¶ 129-63.

Federal jurisdiction is asserted based on plaintiffs' RICO and section 1983 allegations and provisions in the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). The CAFA provides federal jurisdiction over class actions seeking to enforce State law where complete diversity among the parties is absent. In the event that federal jurisdiction over their State law claims cannot be premised on CAFA, plaintiffs assert supplemental federal jurisdiction over

these claims by virtue of their RICO and FNHRA-related section 1983 allegations. *See* 28 U.S.C. § 1367.

Defendants move for summary judgment. Plaintiffs move for class certification. Since defendants are entitled to judgment as a matter of law on all asserted claims, FED. R. CIV. P. 56, it is not necessary to reach the class certification question. *See generally* Linda S. Mullenix, *Dropping the Spear: The Case for Enhanced Summary Judgment Prior to Class Certification*, 43 AKRON L. REV. 1197, 1207-12 (2010) (arguing in favor of pre-certification resolution of dispositive motions).

The case is dismissed.

## II.    Facts

Plaintiffs sue on behalf of all residents "who lived, or currently live, at Prospect Park Residence . . . from 2006 through the present." Am. Compl. ¶ 1. The named plaintiffs are the legal representatives for three individuals who previously resided at the Residence.

Samuel Boykin sues in his capacity as administrator for the estate of John L. Phillips, a deceased resident. *Id.* ¶ 5. Phillips lived at the Residence from May 19, 2007 until his death on February 16, 2008. *Id.* ¶ 91. He moved into the Residence pursuant to an order of the Supreme Court, Kings County. Pls.' Counter-Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pls.' Rule 56.1 Statement"), ECF No. 79-1, at 5.

Melvin Dozier and Kelvin Dozier sue in their capacity as co-guardians of Irene Dozier. She lived at the Residence from July 2008 through August 2012. Am. Compl. ¶¶ 7, 98.

The third plaintiff is Georgia Levis, as administrator of the estate of Mary Joan Barnett. Mrs. Barnett was at the Residence from August 2007 until her death on May 14, 2012. *Id.* ¶ 8.

Two sets of defendants are sued: the "Prospect Park Defendants" and the "Kohl Defendants." The Prospect Park Defendants consist of three entities—1 Prospect Park ALF, LLC; Prospect Park Residence Home Health Care, Inc.; and Prospect Park Residence LLC— alleged to own the Residence and to provide limited health care services to some of the building's residents through an on-site home health care agency. *Id.* ¶¶ 9-13. The Kohl Defendants—alleged to provide operational and financial management services for the Residence—consist of Kohl Asset Management, LLC and Kohl Partners, LLC. *Id.* ¶¶ 14-17. Plaintiffs voluntarily dismissed defendant Prospect Park Residence, LLC. Hr'g Tr. (10:15 a.m. Hr'g) 20, Dec. 12, 2013.

The alleged fraudulent scheme began in May 2006, when Kohl Asset Management, LLC ("KAML") entered into an agreement with 1 Prospect Park ALF, LLC, agreeing that KAML would serve as the "sole and exclusive manager" of the Residence. *See* Affirmation of Adam J. Gana in Supp. of Pl. Mem. in Opp'n to Defs.' Mot. to Dismiss., Ex. E (Management Agreement), Apr. 8, 2013, ECF No. 22-1. Section 2.19 of the agreement requires KAML, in its capacity as manager, to "prepare . . . applications for licensing and other approvals by the appropriate government agencies, as required for the operation of the Facility, if any, to the extent not previously obtained." *Id.* KAML agreed to "promptly obtain all necessary operating certificates after a determination that [the Residence] is required to be licensed." *Id.* Aside from KAML, no other defendant is alleged to have entered into an agreement to take any action with respect to obtaining a license for operation of an assisted living residence.

New York State law requires that facilities providing assisted living services be licensed by the State's Department of Health. *See* N.Y. Pub. Health Law § 4653; *see generally Boykin v. 1 Prospect Park ALF, LLC*, 293 F.R.D. 308 (E.D.N.Y. 2013) (Mem. and Order on Background

of Assisted Living Industry). By contrast with continual medical or nursing care provided to all residents in a nursing home, State law recognizes Assisted Living Facilities as providing only non-health care services such as residential space, room, board, and basic assistance with daily living tasks to some residents. *See* N.Y. Soc. Serv. Law § 2(21); 18 N.Y. Comp. Codes R. & Regs. § 485(a)-(c).

Notwithstanding representations made in the management agreement between KAML and 1 Prospect Park ALF, LLC, no defendant or entity associated with any defendant applied for a license until 2009. Am. Compl. ¶ 69; Pls.' Rule 56.1 Statement, at 7-8. Not until November 2012 did the New York State Department of Health grant the Residence a conditional license to operate as an assisted living residence. Pls.' Rule 56.1 Statement, at 8. The Residence enjoys "conditional approval . . . to continue operating as a licensed" Assisted Living Residence through March 31, 2014. Letter from Valerie A. Deetz, Director, Division of ACF and Assisted Living Surveillance, to Lori Sievers (Dec. 19, 2013) (attached as Ex. A to Supplemental Decl. of Haysha Deitsch, Dec. 31, 2013, ECF No. 92).

Although the New York State Department of Health maintains a publicly available list of facilities that have been licensed to provide assisted living services, Pls.' Rule 56.1 Statement, at 8-9, plaintiffs submit that defendants concealed and misrepresented the Residence's lack of a relevant license in personal conversations, marketing materials, and monthly billing statements. Asserted are several related types of wrongdoing related to article 46-B of the New York Public Health Law, which establishes license requirements for Assisted Living Facilities: (1) defendants affirmatively misrepresented that the Residence was a licensed Assisted Living Facility, when in fact it was unlicensed; (2) defendants impermissibly "called themselves 'assisted living,'" a description reserved for licensed Assisted Living Facilities, *see* N.Y. Pub. Health. L. § 4652; and

(3) defendants unlawfully operated the Residence—which was functionally an Assisted Living Facility—without obtaining a required license, *see* N.Y. Pub. Health. L. § 4653.

Plaintiffs allege that Residence employees made affirmative misrepresentations regarding the Residence's license status on two occasions. Georgia Levis states that in the spring of 2007 she was informed by Jim McWilliams, then the Executive Director of the Residence, that the facility "was a licensed assisted living residence" when she was evaluating potential housing options for her mother, Mary Joan Barnett. Levis Dep. 58, Oct. 2, 2013, ECF No. 67. Kelvin Dozier claims that McWilliams and another Residence employee made similar oral representations in August 2008 when Dozier was exploring housing for his mother. Dozier Dep. 57-58, Oct. 3, 2013, ECF No. 67-1. There is no documentary evidence corroborating these recollections, and plaintiffs do not allege that the defendants ever represented—orally or in writing—that the Residence was "licensed" at any other time.

Plaintiffs also point to evidence suggesting that the Residence was being "held out as" and "operated as" an Assisted Living Residence, which plaintiffs argue was unlawful absent the requisite license. Offered by plaintiffs is a document signed in August 2008—when it is undisputed that the Residence lacked a license—detailing the "rights and responsibilities" of the facility's residents. The document is titled "Rights of Residents in Assisted Living Residences." Pls.' Opp'n to Defs.' Mots. for Summ. J., Ex. 31, Nov. 18, 2013, ECF No. 79. Marie Gustave, the Residence's former assistant director of nursing, states in her deposition that Jim McWilliams told her the Residence was an "assisted living facility." Gustave Dep. ("Exhibit 17") 41-46, Oct. 2, 2012, ECF No. 79-19. Gustave assumed the Residence was licensed, but could not remember whether McWilliams ever affirmatively represented as much. *Compare id.* (Gustave's deposition) *with* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 5, 54 (representing Gustave

"testified Mr. McWilliams told her the Residence was a licensed assisted living residence."). Finally, several documents originating from the defendants—a welcome letter to new families, a Resident Application form, monthly rent bills, and a health evaluation intake form—bear the name "1 Prospect Park ALF" or "Prospect Park Residence, ALF." *See, e.g.,* Pls.' Opp'n to Defs.' Mots. for Summ. J., Exs. 32-36, Nov. 18, 2013, ECF No. 79.

As a result of representations, it is contended that plaintiffs and the class they seek to represent were tricked into paying for services they did not receive. Am. Compl. ¶ 4. In short, they were overbilled for monthly rent and service fees.

Defendants do not dispute that the Residence lacked a license until 2012, but counter that the Residence was never an "Assisted Living Facility" within the meaning of article 46-B of the New York Public Health Law. They deny that they held themselves out as operators of an "Assisted Living Facility," licensed or otherwise, until after they procured the proper license. They emphasize that all three of the named plaintiffs signed virtually identical residential applications containing the following sentences: "Applicant acknowledges that the Residence does not provide health care services and that such services may be provided by any source selected by the Applicant. However, for the convenience of the residents, a licensed home health care agency is located on the premises." Pls.' Rule 56.1 Statement, at 6. This language was on every resident application up until the granting of the conditional license. *Id.* Residents who opted to use the on-site health care agency received two separate bills each month: one from Prospect Park ALF, LLC (for money due under the lease and food and services agreement), the other from Prospect Park Residence Home Health Care, Inc. (for home health care services rendered). *Id.* at 7. Because these services were provided by separate entities, the defendants maintain, the Residence fell outside the scope of article 46-B.

8

### III.    Procedural History

#### A.    State Court Proceedings

Before the initiation of this suit, legal representatives for Phillips, Dozier, and Barnett started actions in New York State court alleging many of the same facts and bringing many of the same causes of action now asserted.

On January 7, 2010, Samuel Boykin, the lead plaintiff in the instant case, in his capacity as administrator for the estate of John L. Phillips, initiated a State wrongful death action against all but two of the present defendants. *See* Am. Compl. ¶ 93; *Samuel Boykin, as Adm'r of the Estate of John L. Phillips, v. Prospect Park Residence Home Health Care, Inc., Prospect Park Residence L.L.C., Castle Senior Living, L.L.C., Castle Senior Living at Prospect Park, Castle at Prospect Park, 1 Prospect Park ALF, L.L.C., Castle Mgmt. Grp., L.L.C., Jane Doe I and Jane Doe II as employees*, Index No. 2851/10 (Sup. Ct. Kings Cnty. Jan. 27, 2010) (attached as Ex. C to Decl. of Kenneth A. McLellan in Supp. of Kohl Defs.' Mot. to Dismiss ("McLellan Decl."), Mar. 25, 2013, ECF No. 19). Boykin's attorney in his State court action also represents him in the present action. Originally asserted in State court were claims for negligence, wrongful death, negligent hiring and retention, breach of contract, medical malpractice, violation of New York State Public Health Law § 2801-d, and violation of FNHRA and 42 U.S.C. § 1983. *Id.*

Boykin's State court action was removed to this federal district court on March 10, 2011. *See* Notice of Removal, *Samuel Boykin, as administrator of John L. Phillips v. Prospect Park Residence Home Health Care, Prospect Park Residence, LLC, Castle Senior Living, LLC, Castle Senior Living at Prospect Park, Castle Management Group, LLC, Jane Doe 1, Jane Doe 11, 1 Prospect Park ALF, LLC*, No. 11-CV-1148 (E.D.N.Y. Mar. 10, 2011). By stipulation, Boykin's

federal causes of action were dismissed on April 21, 2011, and the case was remanded to State court. *See id.*, Stip. & Order, Apr. 21, 2011, ECF No. 7.

On September 12, 2012, approximately three months before the instant class action was filed, Melvin Dozier and Kelvin Dozier, in their capacity as guardians of Irene Dozier, filed a State personal injury action against all but one of the defendants sued here. *See* Am. Compl. ¶ 102; *Melvin Dozier and Kelvin Dozier, as Co-Guardians of Irene Dozier, an Incapacitated person and Melvin Dozier and Kelvin Dozier, Individually v. 1 Prospect Park ALF, LLC, Prospect Park Residence Home Health Care, Inc., Kohl Asset Mgmt., Inc., and Kohl Partners*, Index No. 502761/12 (Sup. Ct. Kings Cnty. Sept. 12, 2012) (attached as Ex. D to McLellan Decl., Mar. 25, 2013, ECF No. 19). Like Boykin, the Doziers are represented in their State court action by two of the same attorneys that represent them and the proposed class in this action. *Id.* Asserted in the Doziers' State court proceedings are claims for negligence, unlawful confinement, fraud, civil RICO, and violation of New York State Public Health Law section 2801-d. *See* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 16.

Mary Joan Barnett's State court action was filed on August 19, 2013. She alleges negligent treatment and care, mismanagement of dementia, and unlawful confinement. The complaint asserts claims for negligence, violation of section 2801-d of the New York Public Health Law, gross negligence, breach of contract, medical malpractice, unlawful confinement, fraudulent representations as to the defendants' status as an enhanced assisted living facility with a secure dementia/Alzheimer's unit, and civil RICO. *See* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 17.

Four additional residents, not named as plaintiffs here, have filed State court actions advancing similar allegations. Hr'g Tr. (10:15 a.m. Hr'g) 6-7, Dec. 12, 2013. Named plaintiffs in

10

the instant litigation emphasize that, despite some significant factual overlap, the "claims in [the] state action[s] do not concern over-billing by Defendants," which is the main focus of this federal court litigation. Pls.' Opp'n to Defs.' Mots. for Summ. J., at 15-19.

**B.    Federal Court Proceedings**

The instant litigation, styled as a class action, was commenced on December 19, 2012. *See* Compl., Dec. 19, 2012, ECF No. 1. By separate motions, the Prospect Park Defendants and Kohl Defendants sought dismissal on the pleadings. *See* Prospect Park Defs. Mot. to Dismiss, Mar. 25, 2013, ECF No. 15; Kohl Defs. Mot. to Dismiss, Mar. 25, 2013, ECF No. 17. Their motions were converted to motions for summary judgment. ECF No. 33, May 31, 2013. Expedited discovery was conducted over the following months.

All defendants filed motions for summary judgment at the close of discovery. Prospect Park Defs.' Mot. for Summ. J., Oct. 31, 2013, ECF No. 60; Kohl Defs.' Mot. for Summ. J., Oct. 31, 2013, ECF No. 62. Plaintiffs simultaneously filed a motion for class certification. Oct. 31, 2013, ECF No. 59.

An evidentiary hearing on the motions for summary judgment and the motion for class certification was conducted on December 12, 2013. At that time, plaintiffs sought leave to conduct limited additional discovery on the issue of rent increases around the time the Residence received its conditional license in late 2012. Hr'g Tr. (10:15 a.m. Hr'g) 31-32, Dec. 12, 2013 ("[COURT:] I will give you a very brief time, but I am not going to open up discovery now . . . . I will allow two weeks for any further discovery that the magistrate judge allows"); Hr'g Tr. (11:45 a.m. Hr'g) 2-3, Dec. 12, 2013, ECF No. 97 (plaintiffs' request to magistrate judge). Defendants were also directed to provide limited additional information regarding the licensing dates for other Assisted Living Facilities in the New York City area. Hr'g Tr. (10:15 a.m. Hr'g)

11

9, Dec. 12, 2013. The parties submitted these additional materials, as well as several "supplemental affidavits" discussed below, in early January 2014.

## IV.    Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). Where, as here, the non-moving party bears the burden of proof, it is incumbent upon that party to identify specific admissible evidence demonstrating a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Anderson,* 477 U.S. at 249. A non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), and "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). If the non-movant fails "to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on" an essential element of the claim, summary judgment is granted. *See Burke v. Jacoby,* 981 F.2d 1372, 1379 (2d Cir. 1992); *see also Anderson,* 477 U.S. at 248–49.

Summary judgment for the defendants is granted on all claims. As detailed below, plaintiffs' article 46-B claim fails for lack of a private right of action, and their remaining State and federal claims fail because plaintiffs have presented no evidence of injuries caused by defendants' alleged misdeeds. Plaintiffs' two federal claims suffer from additional shortcomings.

## V.    Article 46-B / Section 2801-d Claim

### A.    Law

The crux of the action is defendants' alleged violation of several requirements for Assisted Living Facilities set forth in article 46-B of the New York Public Health Law. N.Y. Pub. Health. L. §§ 4650-4663. The origins and structure of article 46-B are addressed in detail in a "Memorandum and Order on Background of Assisted Living Industry in Preparation for Argument on Motions for Summary Judgment and Class Certification." *Boykin*, 293 F.R.D. at 321-327.

At least three distinct claims related to article 46-B are discernible. Plaintiffs contend that the defendants' impermissibly "called themselves 'assisted living'" without applying for a license, receiving approval, and complying with the other requirements of article 46-B. *See* § 4652 (authorizing certain facilities to "call themselves assisted living" if they apply for license, receive approval, and comply with other requirements); § 4656 ("No entity shall . . . hold itself out as an entity which otherwise meets the definition of assisted living or advertise itself as assisted living or by a similar term, without obtaining the approval of the department . . . ."). Plaintiffs argue that the defendants "operate[d] [the Residence] as assisted living" without applying for and being approved for licensing, as required by sections 4653 and 4656. And plaintiffs contend that the defendants affirmatively represented to Dr. Levis and Mr. Dozier that the Residence was a *licensed* Assisted Living Facility, when in fact the Residence was unlicensed. *See* § 4651 (defining "assisted living").

These delicts give rise to a private right of action, plaintiffs urge, by operation of section 2801-d of the New York Public Health Law ("Private actions by patients of residential health care facilities"). This provision appears in article 28 of the Public Health Law, which governs "Hospitals" and other health-related services. *See* N.Y. Pub. Health Law § 2800.

Section 2801-d provides in relevant part: "Any residential health facility that deprives any patient of said facility of any right or benefit, as hereinafter defined, shall be liable to said patient for injuries suffered as a result of said deprivation . . . ." The phrase "residential health care facility" is broadly defined in article 28, and includes "a nursing home or a facility providing health-related services." N.Y. Pub. Health Law. § 2801(3). "Health-related service" means "service in a facility or facilities which provide or offer lodging, board and physical care including, but not limited to, the recording of health information, dietary supervision and supervised hygienic services incident to such service." § 2801(4)(b).

The licensing requirements for Assisted Living Facilities are not found in article 28, but rather in a separate, much newer portion of New York's Public Health Law. *See* N.Y. Pub. Health Law, Art. 46-B; *see also Boykin*, 293 F.R.D. at 321-22 (describing passage of Assisted Living Reform Act of 2004).

## B.    Application of Law to Facts

Plaintiffs maintain that they enjoy a private right of action to challenge defendants' failure to comply with article 46-B's licensing requirements because: (1) the Residence was, during the relevant period, a "residential health facility" within the meaning of section 2801; (2) the defendants' non-compliance with article 46-B denied them a "defined . . . right or benefit"; and (3) the plaintiffs suffered pecuniary injuries—overbilling—as a result of the defendants' violations.

Reading sections 2801 and 2801-d in isolation, it could be argued that the Residence met the definition of a "residential heath facility." Even though plaintiffs signed contracts emphasizing that health-care services were *not* provided as part of the residential lease agreement, the Residence did provide or make available to its senior residents, in addition to

14

lodging and board: physical care, dietary supervision, hygienic services, and recording of health information. These services were provided in large part, though not entirely, through the use of a related on-site home health care agency.

The plaintiffs' expansive reliance on article 28's application, however, suffers from a fatal defect: it overlooks the fact that article 46-B, which governs the operation and licensing requirements for Assisted Living Facilities, expressly provides that Assisted Living Facilities are not "residential care facilities." N.Y. Pub. Health Law § 4651 ("As used in this article . . . [a]ssisted living and enhanced assisted living shall not include[] residential health care facilities or general hospitals licensed under article twenty-eight of this chapter."). This is one of many signals that the private right of action contemplated in article 28, involving claims brought by "patients" of "residential care facilities," does not extend to alleged violations of rights and benefits established under article 46-B—*i.e.*, to claims brought by residents of Assisted Living Facilities. Plaintiffs cannot maintain that they were residents of an unlicensed Assisted Living Facility—which, by definition, is *not* a "residential care facility"—and then invoke a private right of action reserved for patients of residential care facilities.

Bolstering the conclusion that violations of the Assisted Living Facility licensing requirement do not give rise to a private right of action is section 4663, the "Penalties and enforcement" section of article 46-B. Section 4663 provides for penalties imposed, not damages suffered. It reads:

> Any person who violates any provision of this article or any rule or regulation promulgated by the department, or the terms or conditions of any order or permit issued by the department pursuant to this article, *shall be subject* to the maximum *penalties which may be levied* against a licensed adult care facility.

(emphasis added). The Commissioner of the Department of Health is expressly "authorized to . . . exercise all other powers and functions as are necessary to implement the provisions of this article." *Id.* § 4662(e). The "knowing operation" of an Assisted Living Facility without the prior written approval of the Department is a criminal offense, punishable as a class A misdemeanor. *Id.* § 4656(5).

Unlike article 28, which expressly creates a private right of action for "patients" of "residential health facilities," *see id.* § 2081-d, there is no mention of a private right of action anywhere in article 46-B. Conspicuously missing from a lengthy list of "Rights of residents in assisted living residences" in article 46-B is any mention of a right of action for private parties. *Id.* § 4660.

The Department of Health promulgated comprehensive regulations to implement article 46-B in 2008. They vest enforcement authority in the agency. *See* 10 N.Y. Comp. Codes R. & Regs. §§ 1001-1002. The regulations specify administrative enforcement procedures:

> No civil penalty shall be assessed, and no operating certificate shall be revoked, suspended or limited, without opportunity for a hearing held in accordance with the procedures established in 18 N.Y.C.R.R. Part 493 [establishing administrative hearing procedures for residential care programs for adults]; provided, however, that an operating certificate may be temporarily suspended or limited without a hearing for a period not in excess of 60 days upon written notice to the facility that the *department has found* that the public health, or an individual's health, safety or welfare is in imminent danger . . .

*Id.* § 1001.15(e) (emphasis added). Civil penalties are capped at $1,000 per day for any facility. *Compare id.* § 1001.15(f) (establishing maximum administrative penalties for Assisted Living

Residences) *with* N.Y. Pub. Health Law § 2801-d ("[C]ompensatory damages [in section 2801-d actions] shall be assessed in an amount sufficient to compensate such patient for such injury, but in no event less than twenty-five percent of the daily per-patient rate of payment established for the residential health care facility"); *see also Empire State Ass'n of Assisted Living, Inc. v. Daines*, 887 N.Y.S.2d 452, 463 (Sup. Ct. Albany Cnty. 2009) (article 78 challenge to assisted living facility regulations).

The private tort model can play a valuable role in bolstering administrative schemes to compensate victims and deter future wrongdoing, but it can also work mischief when alternative enforcement devices to enforce public policy act at cross-purpose. *See* Jack B. Weinstein, *Compensation for Mass Private Delicts: Evolving Roles of Administrative, Criminal, and Tort Law*, 2001 U. ILL. L. REV. 947 (2001); *see also Carrier v. Salvation Army*, 88 N.Y.2d 298 (N.Y. 1996) (holding that individual residents of adult care facilities do not enjoy implied private right of action for certain relief because it "would be entirely inconsistent with the purposes, mechanism and the underlying legislative and statutory enforcement scheme.") (citation omitted).

Here, the New York State Legislature vested enforcement authority for the new licensing requirements for Assisted Living Facilities with the Commissioner, who, in turn, promulgated regulations implementing the new regime. In addition to the authority to make necessary rules and regulations, article 46-B endows the Commissioner with authority to develop a consumer information guide, "receive and investigate complaints," "make necessary investigations," and "exercise all other powers and functions as are necessary to implement the provisions of this article." *Id.* § 4662. *Cf. Carrier*, 88 N.Y.2d at 330 (rejecting private right of action for adult care facility residents where Department of Social Services implements similar regulatory scheme).

Recognizing a private right of action for lack of licensing could complicate these efforts and reduce pressure for administrative oversight. It would render operators of Assisted Living Facilities liable to many private parties and dramatically increases potential penalties for violations. *Compare* Pls.' Opp'n to Defs.' Mots. for Summ. J. at 23 (offering "conservative[]" estimate of class-wide damages exceeding $5 million) *with* 10 N.Y. Comp. Codes R. & Regs. § 1001.15(e) (capping civil penalties at $1,000 per facility per day, or approximately $2.19 million during disputed six-year period). It would also bypass the administrative hearing process favored by the agency's regulations and upheld by the State's courts. *Empire State Ass'n*, 887 N.Y.S.2d at 463.

Whatever the potential benefits of a robust private enforcement model, it is not the approach established when the New York Legislature vested the Commissioner with responsibility to ensure the effective operation of the laws and complex institutional arrangements for the aged and others needing special protection. Conflicting pressures from a variety of sources might increase costs and confusion, thus reducing overall protections for this class of people in need of assistance and protection.

Plaintiffs may not bring a private action under New York Public Health Law to challenge the defendants' alleged failure to obtain an Assisted Living Facility license. The claim is dismissed.

## VI.  Other State Claims

### A.  Law

The lack of a private right of action under article 46-B does not preclude plaintiffs from asserting related claims derived from the common law or other State and federal statutes. *See Henry v. Isaac*, 632 N.Y.S.2d 169, 171 (App. Div. 2d Dep't. 1995).

Each remaining State claim—negligence *per se*, breach of contract, common law fraud, violations of N.Y. General Business Law §§ 349 and 350, and unjust enrichment—requires plaintiffs to establish more than a bare licensing violation. The plaintiffs must persuade a jury that they suffered harm causally linked to the defendants' wrongdoing. *Sheehan v. City of New York*, 40 N.Y.2d 496, 501 (N.Y. 1976) ("Evidence of negligence is not enough by itself to establish liability. It must also be proved that the negligence was the cause of the event which produced the harm sustained by one who brings the complaint."); *F.D.I.C. v. Drysdale*, 10-CV-4778, 2013 WL 5965723, at *3 (E.D.N.Y. Nov. 7, 2013) ("The elements of a breach of contract claim in New York [include] damages attributable to the breach."); *Gov't Employees Ins. Co. v. Esses*, 12-CV-4424, 2013 WL 5972481, at *4 (E.D.N.Y. Nov. 5, 2013) ("Proving a claim of common law fraud under New York law requires facts demonstrating, by clear and convincing evidence, . . . damages caused by the misrepresentation or omission."); *Andre Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 402 (App. Div. 2d Dep't 2002) ("The elements of [a section 349] action [include an] injury resulting from such [a deceptive consumer-oriented] act."); *id.* ("A [section 350] plaintiff must demonstrate that the advertisement . . . resulted in injury."); *Design Strategies, Inc. v. Davis*, 384 F.Supp.2d 649, 676 (S.D.N.Y. 2005) ("To recover on a theory of unjust enrichment under New York law, a party must establish not only that there was enrichment, but that the enrichment was at the plaintiff's expense.").

## B.    Application of Law to Facts

As the parties were previously advised, May 29, 2013, ECF No. 33, "[a] core issue [at the summary judgment stage] will be whether the plaintiffs can show a compensable injury caused by defendants' conduct. . . ." *See also Boykin*, 293 F.R.D. at 310 (emphasizing parties should address "what damages, if any, flow from lacking a license").

19

On this record, there is no evidence from which a reasonable factfinder could conclude the plaintiffs were actually "overbilled" or otherwise harmed by the defendants' alleged wrongdoing. Summary judgment is granted on each of plaintiffs' remaining State claims.

To illustrate the sorts of injuries that are *not* at issue in this case, consider the deficiencies identified by the Department of Health when the Residence eventually received conditional licensing in late 2012. In order to receive final approval, the Department of Health wrote, the Residence needed to submit a "disaster plan . . . [including] a transfer agreement with a facility outside of the flood zone"; certain stairwells and handrails needed to be repaired; and the agency needed to receive verification that the dishwasher sanitizing temperature reached 180 degrees Fahrenheit. *See* Decl. of Haysha Deitsch in Supp. of Prospect Park Defs.' Mot. for Summ. J., Oct. 31, 2013, ECF No. 60-3. Plaintiffs do not allege that they suffered any direct injury as a result of these shortcomings, or that they would have materially benefitted had the defendants' remedied these problems at an earlier date. Their complaint makes no mention of a disaster requiring the transfer of residents to another facility; physical injuries resulting from poorly maintained stairwells or handrails; or illnesses stemming from inadequately sanitized dishes.

Plaintiffs stake their case on the theory that they were harmed by the defendants' practice of "overbilling." *See, e.g.,* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 20 ("Here, Plaintiffs' state law claims [all] focus on Defendants' overbilling of residents. . . ."). They assert that the defendants were able to command an inflated price for rent and services—some unspecified premium—that they would not have been able to charge had they truthfully represented their licensing status. Implicit in this argument is the premise that the plaintiffs are legally entitled to recover this "premium," even if the quality of the goods and services they received were otherwise identical to what they would have received in a licensed facility.

In the abstract, this issue presents a perplexing question. Consider a homeowner who seeks a plumber for a particularly difficult repair job. The homeowner hires someone she believes to be a "Grade A Master Plumber," a title reflecting the plumber's experience and skill, at $100/hour. In fact, the plumber is only a "Grade B Junior Plumber," whose ordinary rate is $50/hour. Nevertheless, the plumber handles the job flawlessly, fixing the problem with dexterity and swiftness surpassing that of any Grade A Master Plumber available in the area. Has the homeowner suffered a legal injury under New York or federal law?

The instant case does not require reaching this hypothetical. The plaintiffs' evidence falls short on a logically antecedent point: they have failed to introduce any form of evidence from which a reasonable factfinder could conclude that a credential premium for properly licensed Assisted Living Facilities existed during the relevant period.

Despite thorough discovery and exhaustive briefing—the record in this case now exceeds 5,100 pages—there is no evidence that licensed Assisted Living Facilities generally (or the Residence in particular) commanded higher rates during the relevant period when the Residence was unlicensed than comparable unlicensed Assisted Living Facilities in the New York City area. There is no evidence that the Residence charged higher rents for space alone than comparable (non-Assisted Living Facility) apartments in the high-rent neighborhood of Prospect Park, one of the most desirable areas in Brooklyn, or that the sums charged by the defendants for other services (*e.g.*, food, medical care, etc.) exceeded those generally charged by other third-party providers.

Plaintiffs have presented no evidence that, had they known that the Residence lacked an Assisted Living Facility license, they would have sought to negotiate lower monthly payments. They have presented no evidence that, if they had tried to do so, they might have been

21

successful. They have presented no evidence that they would have taken their business to a different Assisted Living Facility if they had known that the Residence lacked a license. *See, e.g.,* Levis Dep. 42-43, Oct. 2, 2013, ECF No. 67 ("The reason I chose Prospect Park [over other area facilities was that] it reminded me of West Virginia . . . . I thought I could take [my mother] out into the park and we could walk in the park and she would feel some sense of home . . . And I thought that the facility physically was appealing, and it was across the street from the park. And for those reasons, I chose Prospect Park Assisted Living. . . .").

There is no evidence that alternative Assisted Living Facilities *with* proper licenses existed in New York during the relevant period. *See* Hr'g Tr. (10:15 a.m. Hr'g) 8, Dec. 12, 2013 ("In 2006, 2007, 2008, '09, '10, '11, there were no licenses, no certifications that had been given by the state. The state hadn't gotten around to it for whatever, due to the bureaucracies. Finally in 2012, they started to issue certifications."); Decl. of Kathy Sindoni, Dec. 31, 2013, ECF No. 92-1 ("From the information on the Department of Health's database, it appears that the Department of Health did not start to issue licenses to assisted living residences until late in 2011."); *see also* New York Department of Health, *Licensed Assisted Living Residences*, available at: http://www.health.ny.gov/facilities/assisted_living/licensed_programs_residences.htm (accessed Jan. 15, 2013) (listing seven licensed assisted living facilities in New York, Kings, and Queens Counties at present time).

Plaintiffs have attempted to cure some of the above shortcomings, explored at length during the December 12, 2013 hearing, by filing "Supplemental Affidavits" from Georgia Levis, Kelvin Dozier, and Samuel Rausman (who originally assisted the State court in finding a suitable facility for plaintiff John L. Phillips). *See* Supplemental Decl. of Brian Brick in Pls.' Opp'n to Defs.' Mots. for Summ. J. (Exs. D-F), Dec. 31, 2013, ECF No. 93. For the first time since the

instant litigation began over twelve months earlier, plaintiffs allege that they relied on

defendants' affirmative misrepresentations when opting for the Residence in 2007 and 2008.

These affidavits arrive more than two months after the close of discovery, *see* Order, Oct. 1,

2013, ECF No. 57, and forty-four days after the plaintiffs filed their Local Rule 56.1 statement

and summary judgment brief, *see* Nov. 18, 2013, ECF No. 79. While the court allowed the

parties an additional fourteen days to conduct limited additional discovery on a specified

separate issue, at no time did the plaintiffs seek or receive leave to file these supplementary

affidavits. *See* Hr'g Tr (11:45 a.m. Hr'g). 2-3, Dec. 12, 2013, ECF No. 97 ("[W]hat we're asking

for specifically . . . are the invoices that at least go with the lead plaintiffs [and] a census list that

shows the residents and information that shows what those rates were [and] very limited

interrogatories."). Because plaintiffs have not explained why they failed to come forward with

this evidence in the regular course of discovery, it is not considered in evaluating defendants'

motions for summary judgment. *See Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004)

(explaining plaintiffs opposing summary judgment must describe "what efforts the affiant has

made to obtain [the additional facts] . . . and . . . why the affiant's [prior] efforts were

unsuccessful" when seeking supplemental discovery).

Plaintiffs' only evidence that might tend to show "overbilling" by the defendants are

reports prepared by the New York City Rent Guidelines Board showing average rents for

Brooklyn during most of the class period. These reports show average rents (throughout

Brooklyn) of $714 per month (2005), $748 per month (2006), $795 per month (2007), $833 per

month (2008), $848 per month (2009), $873 per month (2010), and $925 per month (2011). *See*

Pls.' Opp'n to Defs.' Mots. for Summ. J., at 22-23 (citing attached Exs. 2-13). It is undisputed

that Phillips and Barnett paid significantly more than this amount in monthly rent, *see* Pls.' Rule

56.1 Statement, at 16, 22, and that Dozier paid significantly less, *id.* at 18. By comparing rents charged by the defendants with rents paid by average Brooklynites (many in depressed areas) during the relevant period, the plaintiffs offer a "conservative" estimate that Phillips and Barnett's "overcharge damages" total $1,262.50 and $1,000 per month, respectively. Pls.' Opp'n to Defs.' Mots. for Summ. J., at 23.

Given intra-borough variations in rent, the plaintiffs' data reveal nothing about whether the plaintiffs were overcharged for rent and other services at a facility located at a prime location near Prospect Park. *See, e.g.,* Elena Milin and Lore Croghan, *1 Boro, 2 Worlds: Statistics show a Brooklyn with a case of split personality,* N.Y. DAILY NEWS, Aug. 23, 2012, at 35 ("Now more than ever, Brooklyn has become a tale of two boroughs, with rich and poor in parallel worlds."). Plaintiffs also emphasize that the total monthly fees paid by the three named plaintiffs comfortably exceeded the average monthly rent paid in Brooklyn. This comparison fails for the additional reason that plaintiffs' total charges included fees for meals and other valuable services.

Plaintiffs' proffered an expert witness, Richard Mollot, who testified that 100% of what the plaintiffs paid for rent, food, and other services was an "overcharge." *See* Mollot Dep. 117, Oct. 8, 2013, ECF No. 67-3 ("Q: So, again, just to be clear, are you contending that the services received by Judge Phillips, by Mary Joan Barnett and by Irene Dozier, the three named plaintiffs in this case, were worth nothing between 2006 and 2012?" A: "I would say that they were worth nothing, I would."). Plaintiffs, understandably, make relatively little mention of this untenable testimony in opposing defendants' motions for summary judgment. *See* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 1-73. An expert whose opinion is based on comparative costs of licensed and unlicensed senior living residences might have had some probative force. *See also* Pls.' Rule

56.1 Statement, at 23-25 (conceding that plaintiffs' expert failed to review plaintiffs' rental leases, Food and Service Agreement, or medical invoices in forming "overcharge" opinion; did not engage in any empirical calculations regarding average "base rates" for assisted living; and was unaware of the cost of any assisted living facilities in Kings County, including two comparable Senior Living Residences). This expert has provided no useful proof.

Finally, plaintiffs highlight evidence that rent charges throughout the Residence immediately before and after licensing remained relatively constant; this is proof, plaintiffs maintain, that the Residence was improperly charging inflated prices in the years before it obtained a license. *See* Supplemental Decl. of Brian Brick in Pls.' Opp'n to Defs.' Mots. for Summ. J., Dec. 31, 2013, ECF No. 93, at 3 ("Because Defendants acknowledge that their receipt of an assisted living residence license did not impact costs, Defendants were already charging their residents the rates that a licensed facility would charge *before* they were licensed.") (bold and italics in original); *see also id.*, Ex. A (Rent Spreadsheet) (showing rent increases for three Residence apartments on December 1, 2012, and for three additional Residence apartments on April 30, 2013).

This argument is flawed in at least two respects. First, in order for the absence of a rent increase at the Residence in November 2012 to have any evidentiary significance, it must be assumed that obtaining a New York State Assisted Living Facility license ordinarily leads to rent increases (as a general matter). That critical premise, of course, is the very point that the plaintiffs have failed to establish with evidence. Second, plaintiffs' interpretation of the rent data is sound only if defendants made comparable representations regarding the Residence's licensing status before and after November 30, 2013. Two plaintiffs maintain that they were informed that the Residence was "licensed" facility in 2007 and 2008, but there is no evidence that similar

misrepresentations were made to residents as a whole. Nor is there evidence that the named plaintiffs or any other tenants surmised, from the occasional use of the term "1 Prospect Park ALF" or "Prospect Park Residence, ALF," that the Residence had obtained a license from the State. In contrast, when it appeared the Residence was poised to obtain a license in October 2012, the defendants issued an announcement to all tenants and their family members. *See* Am. Compl. ¶ 82 (noting letter from Executive Director: "I am pleased that Prospect Park Residence anticipates receiving licensure from the New York State Department of Health as an Assisted Living Residence by year's end."). Given such a record, one would expect a sizable *increase* in tenant charges in late 2012, if the alleged "credential premium" existed during the relevant period.

In any event, a host of economic factors could explain why rents have increased, decreased, or remained the same at the Residence in recent years. The evidence presented is not sufficient to create a "genuine issue of material fact" on the issue of overbilling.

The existence of an "overcharge" cannot be inferred. There is an absence of any credible evidence on the point. Since evidence of overbilling is necessary to prove an element of each of the plaintiffs' remaining State claims, summary judgment for the defendants is granted on all of them.

## VII.   Federal Claims

Plaintiffs also assert two federal claims: a claim pursuant to the civil cause of action in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, and a 42 U.S.C. § 1983 claim alleging a deprivation of a right created by the Federal Nursing Home Reform Amendments (FNHRA), 42 U.S.C. §§ 1395i-3, 1396r.

26

These claims fail because of the plaintiffs' failure to adduce any evidence of cognizable harm and for the additional reasons discussed below.

A. **Law**

    *1.    RICO*

RICO provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). "In order to bring suit under § 1642(c), a plaintiff must plead (1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation." *Lerner v. Fleet, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006). Section 1962 provides in relevant part, "[it] shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* § 1962(c).

In order to prevail on the RICO claim, the plaintiffs must establish "seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Hinterberger v. Catholic Health Sys., Inc.*, 2013 WL 4437095 (2d Cir. Aug. 21, 2013) (quoting *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 16–17 (2d Cir. 1983)).

The federal offenses of mail fraud and wire fraud—alleged to have been committed by defendants in this case—are considered predicate offenses that qualify as "racketeering activity." 18 U.S.C. § 1961(1). An essential element of mail or wire fraud is a "scheme or artifice to defraud," which requires "proof that defendants possessed a fraudulent intent." *United*

*States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987); *see also Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir. 1987) ("In general, the mail and wire fraud statutes require, *inter alia,* a showing of intentional fraud."), abrogated on other grounds by *United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989).

2. *Section 1983 / FNHRA*

Section 1983 provides a civil remedy for persons who, "under color of [State law]," have suffered a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Whether a statutory violation may be enforced through section 1983 hinges on "whether Congress intended to create a federal right." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis omitted). "For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.'" *Id.* (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)).

Congress passed the Federal Nursing Home Reform Amendments in 1987 "to provide for the oversight and inspection of nursing homes that participate in Medicare and Medicaid programs." *Grammar v. John J. Kane Regional Centers-Glenn Hazel*, 570 F.3d 520, 523 (3d Cir. 2009). To ensure that "the Federal Government, through the Medicaid program, [did not] continue to pay nursing facilities for providing poor quality care to vulnerable elderly and disabled beneficiaries," FNHRA established quality of care requirements for facilities receiving federal funds and an enforcement regime to halt payments to facilities that have not been properly "certified" by State agencies. H.R.Rep. No. 100-3901, at 471 (1987), reprinted in 1987 U.S.C.C.A.N. 2313-1, 23130272; *see also* Edward J. Cyran, *Implied Causes of Action Under § 1396r: Why* Grammar *Reminds Nursing Home Residents to Actively Participate in Their Own Care*, 115 PENN ST. L. REV. 253, 258-61 (2010).

The federal courts are split as to whether various provisions of FNHRA confer individual rights that are enforceable through section 1983 for Medicaid beneficiaries who reside at substandard, state-run nursing homes. *Compare Grammar*, 570 F.3d at 529 (FNHRA creates enforceable individual rights) *with Baum v. Northern Dutchess Hosp.*, 764 F.Supp.2d 410 (N.D.N.Y. 2011) (FNHRA does not create enforceable individual rights) *and Hawkins v. Cnty. Of Bent, Colo.*, 800 F. Supp. 2d 1162 (D. Colo. 2011) (same).

## B. Application of Law to Facts

### 1. RICO

In addition to the absence of any discernible "injury to the plaintiff's business or property," *see* Section VI.B, *supra*, plaintiffs' RICO claim fails because of a lack of evidence of a "pattern of racketeering activity." *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154 (1987) ("[T]he heart of any RICO complaint is the allegation of a pattern of racketeering.") (emphasis omitted).

Plaintiffs argue that the defendants committed hundreds of acts of mail fraud, one of RICO's predicate acts, by sending monthly rent bills through the mail. Mail fraud "occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1341). A mailing that is "incident to an essential part of the scheme satisfies the mailing element . . . even if the mailing contains no false information." *Id.* (citation omitted).

There is insufficient evidence that the defendants undertook a "scheme or artifice to defraud" necessary to support the mail fraud allegations. 18 U.S.C. § 1341. Central to plaintiffs' allegations is the May 2006 "Management Agreement" signed by 1 Prospect Park ALF, LLC and

Kohl Asset Management. Plaintiffs allege that, pursuant to the agreement, "Defendants falsely marketed their Facility as being an ALR/EALR/SNALR licensed Facility," and "[c]onsequently, both Defendants directed and/or coordinated the unlawful activity, including but not limited to, circumventing New York State licensing requirements." Am. Compl. ¶¶ 172, 173. The cited contract, however, is a pledge to do just the opposite. The Management Agreement reveals nothing more than the parties' intent to follow State law, not subvert it. *See* Management Agreement, ¶¶ 2.19, 2.19.1 ("[DUTIES OF MANAGER:] Manager shall prepare, with the assistance of Client and at the expense of Client in accordance with applicable Approved Budgets, applications for licensing and other approvals by the appropriate government agencies, as required for the operation of the Facility, if any, to the extent not previous obtained . . . . Should it be determined that the Facility is required to be licensed by the State of New York, then Manager hereby agrees to act as, and Client hereby agrees to approve Manager as, the Operator of the Facility. Manager shall promptly obtain all necessary operating certifications after a determination that the Facility is required to be licensed.").

The plaintiffs have uncovered no convincing evidence that the Residence was ever "falsely marketed" as a "licensed" Assisted Living Residence—let alone a joint scheme to market the Residence as such. Two isolated remarks allegedly made to prospective tenants in 2007 and 2008 do not suffice.

The defendants' remaining alleged wrongdoing is of an altogether different ilk. Plaintiffs insist that the defendants misled prospective and current tenants through the improper use of terms like "assisted living," "Prospect Park, ALF," and "1 Prospect Park ALF." Yet plaintiffs concede that the Residence was, as a functional matter, "assisted living" throughout the relevant period: otherwise, the Residence would not be subject to article 46-B. The defendants'

representations were accurate descriptions of the level of services offered at the Residence, even if the State's new licensing regime prohibited the defendants from using the "assisted living" label until after they obtained the requisite license—a prohibition enforced by administrative and criminal law.

To the extent plaintiffs argue that prospective tenants reasonably inferred—based on the defendants' use of these terms and their familiarity with the New York Assisted Living Reform Act of 2004—that the Residence was therefore *licensed*, there is a lack of evidence on this point. None of the plaintiffs have suggested that they were familiar with the legal requirements imposed by the 2004 reforms, let alone that they were misled into believing the Residence was a "licensed" facility by virtue of the State law requirement that only licensed facilities use the label "assisted living."

In sum, there is insufficient evidence of a "scheme or artifice to defraud" to allow a reasonable jury to conclude the defendants engaged in mail or wire fraud, and thus insufficient evidence to support the civil RICO claim. At most, there is evidence that the defendants were negligent, or perhaps reckless, with respect to their obligation to seek the appropriate license from the State Department of Health. There is also evidence, accepted as true for present purposes, that the Residence's former Executive Director made false statements on two occasions. Mail fraud and civil RICO claims, however, require "a showing of intentional fraud" on the defendants' part that animates a corrupt "scheme or artifice." *Beck*, 820 F.2d at 49. Evidence of such a scheme is absent.

### 2. *Section 1983 / FNHRA*

Plaintiffs' FNHRA-related section 1983 allegations are misplaced. It is assumed for the purposes of plaintiffs' argument that the Residence met the statutory definition of a "nursing

home" and FNHRA created "a right . . . enforceable by an action for damages under § 1983," *Grammer*, 570 F.3d at 525, for both Medicaid beneficiaries *and* other nursing home residents. *Compare id.* at 527 ("The provisions are obviously intended to benefit Medicaid beneficiaries *and* nursing home residents") (emphasis added) *with id.* at 530 ("FNHRA . . . place[s] an unmistakable focus on the benefitted class—Medicaid recipients who are residents of Medicaid participating nursing homes").

Plaintiffs' section 1983 claims would still require proof that the deprivation of their federal rights occurred "under color of [State] law." 42 U.S.C. § 1983. The defendants here are private parties, not state actors, and it is undisputed that at all relevant times the Residence "was private pay—not Medicaid." Pls.' Rule 56.1 Statement, at 30.

Plaintiffs have not contended that residents of privately-run nursing homes enjoy a private cause of action directly under 42 U.S.C. § 1396r. *See* Pls.' Opp'n to Defs.' Mots. for Summ. J., at 12-13 ("Section 1983 is a broad vehicle that may be used to bring a wide variety of different claims—and Section 1983 claims require a substantive legal predicate. . . . [Here,] Section 1983 is the vehicle used to bring claims for violations of FNHRA in this action . . . ."); *see generally* Cyran, *Implied Causes of Action Under § 1396r*, at 269-86 (assessing viability of hypothetical FNHRA claims brought against private parties). This issue is not before the court.

## VIII.  Motion for Class Certification

"The decision to award summary judgment before acting on class certification [is] well within the discretion of the district court . . . ." *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998); *accord* Mullenix, *Dropping the Spear*, 43 AKRON L. REV. at 1209 n.61 (listing cases); Barbara J. Rothstein, *Managing Class Action Litigation: A Pocket Guide for*

*Judges* (Federal Judicial Center 2009) (encouraging judges to rule on dispositive motions prior to class certification).

Because summary judgment is granted on each of the named plaintiffs' claims, it is unnecessary to reach plaintiffs' motion for class certification.

## IX.    Conclusion

Summary judgment on each of the plaintiffs' claims is granted. The class certification issue is not reached. No costs or disbursements are ordered.

The case is dismissed.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Dated: January 21, 2014
      Brooklyn, New York